279 So.2d 534

**Carl E. WILLINGHAM.**

v.

**STATE.**

**8 Div. 283.**

Court of Criminal Appeals of Alabama.

May 1, 1973.

Rehearing Denied May 29, 1973.

William H. Rogers, Moulton, for appellant.

**364**

William J. Baxley, Atty. Gen., and L. G. Kendrick, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was convicted of murder in the first degree and his punishment fixed at life imprisonment in the penitentiary. This was his third trial. The first two trials ended in mistrials because of hung juries.

The deceased, Sol Madden, came to his death as a result of knife wounds admittedly inflicted by appellant, who claimed self-defense. The fight between appellant and deceased took place outside a Negro dance hall in Lawrence County, Alabama, known as Otis Davis' Dance Hall. There were no eye witnesses to the fight. According to appellant, he and his wife had been to the dance hall earlier in the night and he carried his wife to her mother's home just across the street from the dance hall and left her there. He went in his automobile to carry someone home and was gone about an hour. He returned to the dance hall and saw the deceased on the dance floor talking to appellant's wife. When his wife saw appellant, she immediately left the dance hall without speaking to him. After his wife left, the deceased came up to appellant and told him that he wanted to see him on the outside. When they got outside, appellant asked him "whereabouts" and the deceased pointed to the north end of the building. According to appellant, he walked toward the north end of the building in front of the deceased. When they got to the north end, the deceased said: "I guess you saw me talking to your wife?". Appellant said, "Yeah." and "I told him there wasn't nothing—that if she wanted him and if he wanted her, that they lived right across the street and that he could walk over there and see her", and he told me "he knowed that."

From the record:

"Q. Did you hear Sol say anything further?

"A. Yes, sir.

"Q. What did you hear him say?

"A. He told me he was going to kill me.

"Q. Then what did you do?

"A. Well, then I stopped and I turned around.

"Q. And when you turned around, did you see Sol?

"A. Yes, sir.

"Q. How was he standing?

"A. Well, he was standing behind me and had a knife up in a stabbing position —sorta just like in a stabbing position.

\*      \*      \*      \*      \*      \*

"Q. Now, then, when you turned around and saw Sol with his knife—you

say you saw him with a knife in his hand and his hand drawn up in a stabbing position?

"A. Yes, sir.

"Q. What, if anything, did you do?

"A. Well, I reached up and we started scuffling and I tried to take the knife from him.

\* \* \* \* \* \*

"Q. Did you grab his knife hand?

"A. Yes, sir.

"Q. Did you all start scuffling?

"A. Yes, sir.

"Q. And in the scuffling did you all fall against anything?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. Go ahead and tell the jury what happened next?

"A. Well, after we started scuffling, well, we fell against the northeast side of the building and fell on the ground.

"Q. Now, you say the northeast side: Would that have been the—

"A. It was on the north over by the east corner.

"Q. Now, can you tell the jury in the scuffling which one hit the building first, you or Sol?

"A. Well, we hit it together.

"Q. And then what happened?

"A. Well, then that is when I got cut on my hand and—

"Q. Which hand did you get cut?

"A. The right hand.

"Q. Where were you cut?

"A. I was cut in three different places on my thumb and pointer finger.

"Q. On your what?

"A. Pointer finger.

"Q. Pointer finger?

"A. Yes, sir.

"Q. You were cut in three different places there?

"A. Yes, sir.

"Q. Did he cut you before you hit the building or afterwards or when did he cut you, or do you know?

"A. Well, I think it was before we hit the building.

"Q. And then you and Sol engaged in a scuffle?

"A. Yes, sir.

"Q. After you hit the building, then what happened?

"A. Well, after we hit the building, we fell on the ground. And so that is when I got my knife out of my pocket with my hand and opened it up with my teeth. I was holding his knife hand with my other hand.

\* \* \* \* \* \*

"Q. Now, then did Sol—when you hit the ground, did Sol still have the knife in his hand?

"A. Yes, sir.

"Q. Did you get the knife away from Sol?

"A. No, sir.

"Q. And then you got your knife out of your pocket?

"A. Yes, sir.

"Q. In the scuffle there on the ground?

"A. Yes, sir.

"Q. And was that when you cut Sol?

"A. Yes, sir.

"Q. Do you know how many times you cut him?

"A. Well, no, sir, I don't know exactly how many times. It was several times but I don't know exactly how many.

"Q. Then what happened?

"A. Well, after I did that, somebody came around there and got me up off of the ground.

"Q. Where was Sol?

"A. He was on the ground.

"Q. Did you see him do anything when they got you up off of the ground?

"A. Yes, sir, he got up and tried to pick up a 2 by 4.

"Q. And what did he do with that 2 by 4?

"A. Well, he never did get it all of the way up. He dropped it and sorta stumbled out.

"Q. Sir?

"A. He dropped it and sorta stumbled toward the northwest corner and fell.

"Q. Did he get up any more?

"A. No, sir."

On cross-examination appellant testified that he was six feet two inches tall and weighed around two hundred and fifty-five pounds; that the deceased weighed about one hundred and fifty pounds.

Appellant further testified on cross-examination that he and the deceased were scuffling on the ground and while he was trying to take the knife out of the right hand of deceased, he got cut; that he got his knife out of his pocket, opened it with his teeth and cut the deceased several times; that the deceased was not hurting him before he started cutting him; that he was stabbing him pretty hard and that it was his intentions to stab him as hard as he could. After stabbing him several times, appellant got up and he did not see the knife he claimed the deceased had drawn on him and cut him. Somehow the knife went missing.

"Q. And when he got up after you had stabbed him seven times and cut his arm, and he got up there and dropped that 2 by 4, somewhere there he had gotten rid of that knife, hadn't he?

"A. Yes, sir, I didn't see it."

Appellant contends that the trial court committed reversible error in granting the state's motion to strike the plea of former jeopardy. As above stated this was the third trial of appellant upon this indictment, the first two trials ended in mistrials because of the failure of the jury to reach a verdict. Title 30, Section 100, Code of Alabama 1940, empowers the trial judge to declare a mistrial "when in the opinion of the court or judge there is a manifest necessity for the discharge, or when the ends of justice would otherwise be defeated." The statute fixes the reason for a discharge of the jury and of necessity leaves it to the opinion or discretion of the judge or court to determine whether or not the reason as fixed by law really exists. Since a mistrial is no trial, appellant was not placed in double jeopardy and there was no error in granting the state's motion to strike the plea. Andrews v. State, 174 Ala. 11, 56 So. 998; Hallman v. State, 36 Ala. App. 592, 61 So.2d 857.

Appellant next contends that since he was charged with a capital offense, the trial court erred in requiring him to strike from a jury list containing less than thirty qualified jurors. The record affirmatively shows that the strike list contained the names of twenty-nine (29) qualified jurors. At the outset of the trial, the state waived capital punishment. This alone serves to dispose of appellant's insistence of error. Moreover, no objection was made in the court below to striking from a list of less than thirty qualified persons, hence nothing is presented for review. Ex parte Campbell, 278 Ala. 114, 176 So.2d 242; Autrey v. State, 44 Ala. App. 53, 202 So.2d 88; Washington v. State, 44 Ala.App. 190, 204 So.2d 835.

Fred R. Gillespie was called as a witness for the state to prove the cause of death. He testified that he assumed the office of coroner of Lawrence County in January, 1971, but that he had eight years as acting coroner; that he was thirty-nine years of age and had worked as a mortician in a funeral home since he was fifteen years of

age; that his duties as coroner, acting and deputy coroner, encompassed making examinations of bodies and determining the cause of death. He testified that he also helped and assisted in doing autopsies. Over appellant's objections, he testified that he examined the body of the deceased and found seven stab wounds and one laceration in the upper body and torso. He was asked to locate these wounds and said:

"There was one stab wound just above the left elbow on the left arm; there was one four inches below and slightly to the right of the left nipple; there was one slightly to the right—two and a half inches to the right and below the left nipple, and one one and three-eights inches above the left nipple; there was a stab in the left shoulder and a stab in the left temple one and one-half inches from the center line towards the eye from the center line of the left ear. And there was a stab wound five and a half inches below and to the right of the right nipple."

He was asked his opinion as to the cause of death and replied that the instrument that entered the body two and one-half inches to the right of the left nipple as it penetrated into the left ventricle of the heart caused the death.

█ It has been said that a person who is a coroner does not *per se* qualify him to express an opinion as to the cause of death. However, where experiential qualifications are shown, a person who is a coroner or undertaker may be qualified to testify to the cause of a particular person's death. Page v. State, 41 Ala.App. 153, 130 So.2d 220; Jordan v. State, 40 Ala.App. 693, 122 So.2d 545; Ward v. State, 44 Ala.App. 229, 206 So.2d 897.

In Kozlowski v. State, 248 Ala. 304, 27 So.2d 818, the Supreme Court said:

"Whether or not the qualification of a witness to state his opinion is sufficiently established is a matter resting largely in the discretion of the trial court and its ruling thereon * * * ordinarily will not be disturbed on appeal unless there is a clear showing of abuse. If the witness has some qualifications, he should be permitted to testify."

█ Certainly, this witness had some qualifications over and beyond the experience and knowledge of the "average run" of layman, and there was no abuse of discretion in permitting him to testify as to the cause of death.

█ It is the general rule that a defendant who voluntarily takes the witness stand in his own behalf and testifies without asserting the privilege against self-incrimination, waives his privilege as to the testimony given and the same may be used against him in a subsequent trial for the same offense. Decennial Digest, Criminal Law, ☞406(4) and ☞539(2). This rule is so broad that even if the defendant does not take the stand at the second trial this does not prevent the use of his testimony at the former trial.

In Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047, the court per Mr. Justice Stewart said:

"In this case we need not and do not question the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him."

In this state this rule is applied to inculpatory statements in transcript of testimony voluntarily given by a defendant in the prosecution of another for crime. Green v. State, 24 Ala.App. 235, 133 So. 739.

We have carefully examined the great number of refused charges requested in writing by appellant. Those that are not

abstract, or misleading or misstatements of the law were adequately and substantially covered in the court's oral charge to the jury.

The life sentence imposed by the jury in this case seems harsh in the light of the failure of two previous juries to agree upon any degree of homicide but this punishment was peculiarly within the province of the jury.

We find no reversible error in the record and the case is due to be affirmed and it is so ordered.

Affirmed.

All the Judges concur.