324 So.2d 305

**Jerry McDANIEL**

v.

**STATE.**

**6 Div. 857.**

Court of Criminal Appeals of Alabama.

Oct. 21, 1975.

Rehearing Denied Nov. 18, 1975.

Philip P. Nelson, Birmingham, for appellant.

William J. Baxley, Atty. Gen., and David L. Weathers, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Under an indictment for murder in the first degree appellant was convicted of murder in the second degree and sentenced to thirty years in the penitentiary. He was represented by retained counsel who also represents him on appeal. At arraignment he pleaded not guilty.

There was no motion for a new trial and no request for the affirmative charge, but there was a motion to exclude the state's evidence which puts us to a summary of the evidence.

According to the state's evidence the deceased was shot three times in the back by appellant on the night of September 8, 1972, outside a place called Saxton's Place in the Bradford Community of Jefferson County, Alabama. All parties involved were Negroes. Saxton's Place was known as a "shot house." It was owned and operated by John Saxton who sold alcoholic beverages including whiskey, wine and beer. He also sold soft drinks, potato

chips and other like items. There were fifteen to twenty people at this place on the night of the shooting, some on the inside and some on the outside.

Sandra Alisa Blakely testified that she went to Saxton's that night with some girl friends. She sat with one Andy Jackson some fifteen to twenty minutes. She did not drink anything except a Sprite drink which Jackson bought her. After drinking the Sprite she moved back to her table.

She further testified that she had known the deceased all of her life. That she had known appellant, Jerry McDaniel, and his brother, Jessie, for several years. She stated that appellant and his brother were not at Saxton's when she arrived but the deceased was there sitting at a table. Around 9:00 o'clock she went outside to the car to get a package of cigarettes out of the glove compartment of the car she came in. When she got outside, she saw appellant, his brother and one Jeffrey Griggs standing and talking. She did not see the deceased at this time. After getting her cigarettes, she heard the deceased and Jessie McDaniel arguing. The only thing she heard the deceased say to Jessie McDaniel was, "Do you have anything?" Jessie McDaniel replied that he did not have anything and raised his hands in the air for a few seconds. She saw appellant standing behind the deceased with a gun in his hand. When Jessie McDaniel raised his hands, Jerry McDaniel shot twice and then a third time. She stated she did not see a pistol in the hands of the deceased and did not see any muzzle flashes or anything that looked like the deceased was shooting a pistol. She said the deceased did not say or do anything to appellant before appellant shot him three times. That after the third shot appellant ran behind the building and the deceased ran after him. She went inside Saxton's Place and told the people that Jerry McDaniel had shot Calvin Joe Tart. She and the others came out of the building and found the deceased on the ground. She did not see any weapon around the body. She and the other people put the body in a car and carried it to his mother's house and then to the hospital.

Jeffrey Griggs testified that he went to Saxton's on the night of September 8, 1972, in a car with Jessie and Jerry McDaniel. He said when they arrived, they went inside and talked to a few people. That he saw the deceased and Sandra Blakely on the inside of Saxton's when they arrived. He stated that he knew Andy Jackson but could not recall seeing him that night. That some time later he, Jessie McDaniel, Jerry McDaniel, and Calvin Joe Tart went outside the building and were just standing around talking. That he recalled Sandra Blakely come out and that was three or four minutes before the shooting. He did not see Sandra go back in the building. That the deceased started arguing with Jessie McDaniel about a package of cigarettes. The deceased was leaning with hands across the trunk of a car. He saw Jessie McDaniel's hands go up in the air for a second or two and after that appellant shot the deceased three times and he saw fire come from appellant's gun. That the deceased did not do anything until the last shot was fired. After that the deceased stood up and turned around and looked at appellant and appellant started running behind the building and the deceased started running after him. He further testified that he did not see anything in the hands of the deceased and he did nothing to appellant that night. He stated three shots were fired and no more from behind the building when the deceased was chasing appellant.

Deputy Sheriff J. R. Horton and his partner Deputy Frank Murray went to Saxton's Place on September 8, 1972, in response to a radio dispatch to investigate a shooting. They arrived at the scene of the shooting at 11:20 p. m. and talked to John Saxton and got his version of the shooting. The victim had been carried to the hospital prior to their arrival. They got from Sax-

ton the names of the persons who probably witnessed the shooting. They were Jeffrey Griggs, Jessie McDaniel, Jerry McDaniel and Sandra Blakely. Saxton showed them where they found the body of the victim. They did not find a weapon around where the body was found or anywhere near the scene. They called Detectives Don Haynes and Tom Swatek and turned the investigation over to them along with the names of the witnesses. He went with Sergeant Haynes to talk to Sandra Blakely and another person. They found out the address of Jerry McDaniel and drove to his house. Appellant's mother and father met them at the door and they asked if Jerry was there and they said yes and let them in the house. They found appellant in bed asleep. They got him out of bed and placed him under arrest. Detective Tom Swatek actually made the arrest. After the arrest appellant rode with the detectives to Saxton's Place and attempted to show the officers where he lost the weapon. The weapon could not be found and appellant then told the officers the pistol was at Willie Woods' house. Woods was appellant's cousin. They went to Willie Woods' house which was seven or eight miles from Saxton's Place and got the pistol. It was a .38 caliber pistol, serial number 18025, and it was nickel plated. When appellant was arrested, he was given his constitutional rights by reading a *Miranda* card. After reading the *Miranda* card appellant told them he lost the weapon behind the building when he was running from the scene of the shooting. After the officers recovered the death weapon, appellant was placed in jail and charged with murder.

Mr. Charles C. Robey, a Deputy Coroner of Jefferson County, testified that he had worked for the Coroner's Office a little over two years. He described his duties as investigating all types of violent deaths and homicides, suicides, accidental deaths and sudden and unexplained deaths. That he was Deputy Coroner in September of 1972 and received a call from University Hospital at 11:20 that night and he arrived at 11:50 p. m. He viewed the body of the deceased and found he was dead. He made an examination of the body. He noticed several bullet wounds. There were two entrance wounds in the back. The first wound was a superficial wound and entered in the front area. The second wound entered the back and was three inches to the right of the middle line of the body and twenty-two inches down from the head. Wound number three entered the back and was four inches to the left of the middle line of the body and twenty-two inches down from the top of the head.

He further testified that he signed the death certificate, that the cause of death was the result of multiple gunshot wounds in the back. He stated that some of the bullets struck vital organs. He said bullet number three went through the liver, hit a bone, bounced back through the liver tearing the liver. He stated that bullet number one was not calculated to cause death but that the other two would cause death. He was asked to give his opinion as to the cause of death and appellant's counsel objected based on the failure of the witness to be qualified as an expert.

Thereupon the court asked the witness how many bodies had he examined and what courses he had taken. The witness replied that he had examined many bodies and that in preparing himself for the Coroner's Office, he studied several textbooks in order to take the Civil Service Test. That he had several years on-the-job training with the Sheriff's Office and a year and a half with the Tarrant Police Department.

He further testified that an autopsy was performed on the body of Dr. John Simmons, Assistant Pathologist and it was performed under the direction of Dr. Crawford, a practicing pathologist, and that he worked with Dr. Simmons in performing this autopsy. He was then asked if he and Dr. Simmons reached a conclusion as to the cause of death. There was an objec-

tion and a request for a voir dire examination.

On voir dire:

"Q (BY MR. NELSON). What is the date this examination was made?

"A It was on the 9th and 8th, '72. That's September the 8th.

"Q And how long had you been in the Coroner's Office at that time?

"A Two months.

"Q And how many bodies had you examined at that time?

"A Many.

"Q How many?

"A I don't have an estimate.

"Q Twenty?

"A I don't have an estimate.

"Q Was it less than twenty?

"A You will have to look at our records, of course. We keep a record of that.

"Q Well, was it a hundred?

"A I don't have any estimate.

"THE COURT: Give us your best judgement at that time.

"A I would say it would probably be less than a hundred and probably more than twenty.

"Q What training had you had at this time?

"A The training that was required by the Civil Service in order to take the Coroner's Exam and be appointed a Deputy Coroner.

"Q What training is that?

"A That is a three year—at least three years investigative experience in the law enforcement field. And—

"Q No, sir. I'm asking you what training you had. I'm not asking you what the requirements were for Civil Service. What training did you actually have?

"A Well, the training and requirements would be the same.

"Q What formal training did you take? Did you attend any schools?

"A I have trained—you mean attended law enforcement schools?

"Q No, sir. Have you had any formal training in investigation of causes of death, formal training in a school?

"MR. TUCKER: Your Honor, may I say that we just offer his opinion not as a doctor. We understand he is not a doctor and we understand that he is not a pathologist. He's simply a Deputy Coroner. But he is trained to give to give his opinion, for whatever its worth, as to the cause of death. And that is for the jury to determine, may it please the Court, how much credance they will give to this man's opinion. And that's all we offer it for.

"THE COURT: All right. Proceed Mr. Nelson.

"MR. NELSON: Your Honor, if it please the Court, I don't have any more questions on voir dire. But if it please the Court, this man is not qualified to give that."

The objections as to the testimony of the Coroner were overruled and he said:

"In my opinion the cause of death was multiple gunshot wounds to the back."

A bullet was removed from the body of the deceased and photographs were made of the body and introduced in evidence. Also photographs were made of the scene of the shooting and were introduced in evidence.

The pistol and the bullet recovered from the body of the deceased were personally

delivered to Robert B. Johnson, Assistant State Toxicologist in charge of the Birmingham Division. He testified that he test-fired the pistol to make a comparison with the known bullet removed from the body of the deceased. He testified that the evidence bullet was similar in all gross respects but the pistol was so old that he could not say the evidence bullet came from that particular gun. He further stated there was nothing inconsistent but he could not tell for certain that the evidence bullet came from the pistol that appellant used to kill the deceased.

He further testified that he examined a specimen of blood from the deceased and found he had an alcohol level of .018 percent, which is considered to be intoxicated.

The mother of the deceased was recalled and testified her son was five feet, nine inches tall and weighed 130 pounds.

The state rested at this point and appellant's counsel moved to exclude the state's evidence on the ground the state failed to prove its case against the defendant and failed to make out a prima facie case. This motion was overruled.

Appellant testified in his behalf and offered the testimony of his brother and Andy Jackson.

The testimony of Andy Jackson was in direct conflict with Sandra Blakely as to the actual shooting. He admitted being in Saxton's Place on the night of the shooting and also that Sandra sat at the table with him for about twenty minutes. He further stated that Sandra asked him for a cigarette and he got up to go outside for that purpose. That when he got to the door he heard shooting on the outside and Sandra was still inside the building at that time. That he never saw Sandra outside the building where the shooting was going on. He stated he heard about five shots but did not witness the shooting.

Jessie McDaniel testified that he and his brother, Jerry, appellant, Everett Lawson,

and Robert Roberson went to Saxton's Place on the night of September 8, 1972, between 8:00 and 9:00 o'clock. They went in Lawson's car. He said Jeffrey Griggs was already there when they arrived. That he told Griggs he was going to buy him a beer because Griggs bought him one the last time they were there. He testified that he gave Griggs the money and Griggs was going to send him back a pack of cigarettes by Andy Jackson. When he did not receive the cigarettes, he asked Griggs about them and was told a man by the name of Robert Threadgill had his cigarettes. He said he went to the car where Threadgill was and asked about his cigarettes. That the deceased was present and told Threadgill not to give him the cigarettes and started using profanity. Jessie said when this happened, he turned and walked away. That the deceased walked back inside the building and the next thing he knew the deceased came out the door and threw a pistol in his face. That when the deceased threw the gun in his face, appellant hollered out, "Don't do that, man." That the deceased turned and he and appellant started shooting at each other, both were shooting at the same time and in his judgment the deceased fired four or five times. He then stated, "After the shooting he chased my brother behind the house." He further said he did not run away until after the shooting.

On cross-examination he testified:

"There were about fifteen or twenty people at Saxton's Place that night. I don't know exactly how many shots were fired, but there were several of them. Calvin Joe Tart fired four or five times, but I don't know how many Jerry McDaniel fired. They were having a gun battle. My brother, Jerry McDaniel, fell down twice and as Tart was shooting, he fell down twice."

Appellant testified that he was at Saxton's Place on the night of September 8, 1972, and saw the deceased there and spoke

to him. He stated the deceased was inside the place when he first arrived. A few minutes later he went outside where his brother and Jeffrey Griggs were talking. That his brother and the deceased started arguing. The deceased threw a gun in his brother's face and he hollered and told him not to do that. The deceased turned and shot, "and I shot at the same time. The deceased fell and then shot again: Then Tart chased me behind the building and he was still firing at me."

On cross-examination he was shown the pistol which the state introduced in evidence and stated, "That is my gun, but I did not shoot him."

On re-direct examination appellant said he did shoot the gun on September 8, 1972, but he didn't know if he hit anyone or not. He stated that from the time the first shot was fired until the last one, about ten seconds elapsed.

Appellant contends this case should be reversed on two grounds, (1) the court erred in permitting the Deputy Coroner to testify as to the cause of death, and (2) the failure to give a written charge to the effect that the verdict must be unanimous.

We will treat these contentions in the order in which they appear.

In *Willingham v. State*, 50 Ala.App. 363, 279 So.2d 534, this court said:

"It has been said that a person who is a coroner does not *per se* qualify him to express an opinion as to the cause of death. However, where experiential qualifications are shown, a person who is a coroner or undertaker may be qualified to testify to the cause of a particular person's death. *Page v. State*, 41 Ala. App. 153, 130 So.2d 220; *Jordan v. State*, 40 Ala.App. 693, 122 So.2d 545; *Ward v. State*, 44 Ala.App. 229, 206 So. 2d 897.

In *Kozlowski v. State*, 248 Ala. 304, 27 So.2d 818, the Supreme Court said:

'Whether or not the qualification of a witness to state his opinion is sufficiently established is a matter resting largely in the discretion of the trial court and its ruling thereon * * * ordinarily will not be disturbed on appeal unless there is a clear showing of abuse. If the witness has some qualifications, he should be permitted to testify.'

Certainly, this witness had some qualifications over and beyond the experience and knowledge of the 'average run' of layman, and there was no abuse of discretion in permitting him to testify as to the cause of death."

■ We find no error in the ruling of the court on the point here under discussion. See *King v. State*, 266 Ala. 232, 95 So.2d 816; *DeSilvey v. State*, 245 Ala. 163, 16 So.2d 183; *Gettings v. State*, 32 Ala. App. 644, 29 So.2d 677; *Ward v. State*, 56 Ala.App. 591, 324 So.2d 305.

■ As to the second contention we take the following excerpt from the court's oral charge to the jury:

"And of course, it must be a unanimous verdict."

In addition to the above the jury was polled and each separate juror told the court, in the presence of appellant, that the verdict rendered was the verdict of the twelve jurors.

We have carefully examined the record for errors injuriously affecting the substantial rights of appellant and have found none.

The judgment of conviction is affirmed.

AFFIRMED.

All the Judges concur.