PETITION FOR WRIT OF MANDAMUS OR, IN THE ALTERNATIVE, FOR WRIT OF CERTIORARI
Through a petition for writ of mandamus filed in this Court, Josephus Anderson seeks to prevent his further prosecution and retrial for the capital murder of Birmingham Police Officer Albert Eugene Ballard. After a review of the issues raised, we deny the relief sought.
On the 29th of November, 1979, Officer Ballard was fatally shot while on duty in downtown Birmingham. Anderson was indicted that December. His motion for a change of venue was granted and his trial was transferred to Mobile County. There, he has been tried three times for the same offense. Each trial resulted in a mistrial because of the inability of the jury to reach a verdict. Now, the State seeks to try Anderson a fourth time.
At the conclusion of each trial, defense counsel filed a plea of former jeopardy or, in the alternative, a motion to dismiss. After the third trial, he also filed a motion for judgment of acquittal. Each plea and motion was denied. The jury's vote in each trial was stipulated to by defense counsel and the district attorney. In September of 1983, Anderson filed a petition for writ of mandamus in this Court seeking to terminate his further prosecution for the capital offense by requiring the trial judge to either sustain his plea of former jeopardy, grant his motion to dismiss, or grant his motion for judgment of acquittal.
In this mandamus proceeding, Anderson maintains that a fourth trial after three prior mistrials constitutes a denial of due process, violates traditional notions of fair play and substantial justice and results in an abandonment of the reasonable doubt standard. He also maintains that another trial would violate his Fifth and Fourteenth Amendment privileges against double jeopardy under the Constitution of the United States and Alabama Constitution Article I, Section 9.
 I. THE FACTS A. The First Trial
Anderson was first tried in March of 1981. The trial judge (Joseph M. Hocklander) declared a mistrial after the forewoman *Page 437 
of the jury informed the judge that the jury was having difficulty and "might not even be able to get a verdict." Judge Hocklander encouraged the jury to continue deliberating to reach a verdict. He questioned the forewoman as to the benefit of further deliberation and then asked the other members of the jury what they thought ("Does anyone feel that further deliberation would be of benefit?"). He also inquired if any disagreed with the forewoman's answer.
Although we have only a portion of the record of Anderson's first trial before us, we find no specific objection in the record to the declaration of the mistrial. Indeed, although the record does not reflect why, there is an indication that defense counsel had earlier requested a mistrial.
 "MR. CLARK: If they have not reached a verdict, do you intend to let them deliberate longer?
"THE COURT: No.
 "MR. CLARK: Could we approach the bench just a second?
(Bench:)
 "MR. CLARK: It's only actually been about four hours. It's a four-day trial.
 "THE COURT: That's coming from the man who wanted the mistrial last night.
"MR. CLARK: That was denied.
 "THE COURT: I considered it very seriously. Bring them in. I'll see what they have to say."
Although this is all the record shows on this matter, defense counsel maintains, and we have no reason to believe otherwise, that, when Judge Hocklander indicated that he was going to declare a mistrial, counsel "asked him if he would permit the jurors to deliberate further and he denied that request." When the mistrial was declared, the jury had deliberated for four hours after a four-day trial and stood ten for acquittal and two for conviction.
 B. The Second Trial
Anderson's second trial was in November of 1981. The record shows that the trial judge (Telfair Mashburn) brought the jury into the courtroom "because it's obvious that you must be having problems arriving at a verdict since you've been out since twenty-five minutes till nine this morning." The judge encouraged the jurors to reach a unanimous verdict and gave a charge consistent in principle with Allen v. United States,164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). Before the jury resumed deliberation, the foreman indicated "(t)hey want to stay here as late as possible to see could we come to a decision."
Approximately one hour and forty-five minutes later the judge had the jury brought back into the courtroom and determined, by questioning the foreman, that there was "no possibility of your arriving at a verdict" and that they were "no closer than you were" before. Judge Mashburn then stated:
 "If there's no objections, I'm going to discharge this jury and declare a mistrial in this case.
 "All of you agree that you would be unable to arrive at a verdict if I kept you here any longer?
"(Jury indicated in the positive.)"
The record reflects no objection to the declaration of the mistrial. The jury had been deliberating for seven hours after a four-day trial. The vote was nine for acquittal and three for conviction.
 C. The Third Trial
Anderson's third trial was in March of 1983. The trial judge (Mashburn) stated to the jury, "Now they tell me that you've reported that you are unable to arrive at a verdict?" The foreman replied, "That's correct" and, in response to further questioning, indicated that the jury was "hopelessly deadlocked". Judge Mashburn gave an "Allen" instruction and sent the jury back into the jury room. He then stated to defense counsel:
 "THE COURT: I'm going to give them an hour or hour and a half and if they still say they are hopelessly deadlocked, I think I'm going to withdraw the case from them and declare a mistrial. What do you think about that Mr. Clark? *Page 438 
 "MR. CLARK: Let's just wait and see. I don't know. That may be the only thing to do."
Defense counsel then requested a mistrial on the grounds that some lawbooks had been in the jury room during the jury's deliberation. After ascertaining that none of the jurors "looked at anything on that desk and none of you discussed anything on that desk in your deliberations", the judge denied the mistrial.
The jury had been deliberating for four and one-half hours after a five-day trial when the following occurred:
 "THE COURT: Now you understand what I plan to do. Bring them out here and ask them if there's any possibility of them getting a verdict. Pointing out that it's not fair to the defendant or the State either not to have one but that if they are convinced they are not going to be able to reach a verdict no matter how long they stay back there then there's nothing I can do but discharge them.
 "MR. CLARK (Defense Counsel): I think you will let them know that when you say it's not fair that none of us are mad at them. We all know they've been making a real effort. (emphasis added)
 "THE COURT: I wasn't going to say anything about that. Just that it's not fair to the defendant and the State. I don't mean to these people, to the institution. Bring them on in.
(JURY PRESENT.)
 "THE COURT: All right, Mr. Foreman, you still not able to reach a verdict?
 "MR. FOREMAN: No, sir; we are not able to reach a verdict.
 "THE COURT: And you don't think that you would be able to reach one if I kept you in there longer?
 "MR. FOREMAN: I don't think we would be able to reach a verdict if you kept us longer.
 "THE COURT: You know I'm faced with the proposition that it's not fair to the defendant and not fair to the State. When I say the State, I don't mean these two lawyers representing them. I mean the institution. To have the thing and not have it resolved. But as I explained to you this morning you've been a good jury and you've listened to the case patiently. I don't think the whole week I've observed one of you looking like you weren't wide awake and paying attention to what was going on and after all that's the necessary thing because if you are asleep or if you are stargazing you certainly can't be aware of what's going on. And do all of you feel that it's just a matter that you can't resolve no matter how long you stay back there.
"(Jury indicated in the positive.)
 "THE COURT: All right, reluctantly, I'm going to discharge you and declare a mistrial."
The jury was split eight for acquittal and four for conviction.
This record contains no indication that the State intends to present any new evidence at Anderson's fourth trial.
In denying Anderson's plea of former jeopardy, Judge Mashburn expressed his firm belief in Anderson's guilt. This belief plays a significant role in our decision. In denying the motion after the second trial, he stated:
 "I'm not going to turn loose a man that I feel (is guilty) from the evidence and I don't see how 9 people could come out of there after listening to that evidence for four days and say that man was not guilty. I will never be able to understand that."
. . . .
 "(I)f there was some doubt about his guilt in my mind, I might consider your motion, Mr. Clark. But since I'm convinced he is guilty from the evidence I heard, I'm going to deny your motion."
After the third trial another hearing was held on the double jeopardy issue. During that hearing Judge Mashburn stated:
 "THE COURT: Well, let me say this. I tried the case twice, heard the evidence from beginning to end, believe I'm more familiar with it than either of these gentlemen and how any reasonable man *Page 439 
could have any doubt as to the defendant's guilt on the evidence that the State brought here the two times I heard it tried is beyond my comprehension. We had a man, had the people from the savings and loan association that a man with a leather coat, cutie looking cap, came in, threw a gun on them, took money, took traveler's checks, they gave him marked money, they had the numbers of the traveler's checks, they turned in burglar alarms, had people that heard the burglar alarm, the time frame worked out fairly close, that just a few minutes later a few blocks — two or three blocks from here — there was this man. I admit there was quite a bit of confusion but that one black witness that testified never had any hesitation saying that's the man that the policeman stopped and walked over to his car, reached down and picked up something either out of a bag — nobody knew exactly where he got it — leaning in that car, shot that policeman when the policeman had done nothing except call him over to the car to talk to him. We had these other people tracing him on. It was incongruous that one witness testified about a hat with a brim all the way around it. But in the excitement there would certainly be some discrepancies but they almost tracked him right on down to the place where he was shot and there you found them picking up the money, marked money, from the savings and loan. The identifiable traveler's checks. You've got the gun that two people testified fired the shot not only there at the scene but fired the shots that killed this policeman. You remember that I told you that I had read somewhere where there had been rulings that two mistrials were equal to an acquittal. But having heard the evidence and as I say just being mystified how any reasonable person could fail to believe that that was the man that shot that policeman is beyond my comprehension. I don't need any argument from the State to deny that motion."
In reply to defense counsel's objection to the correctness of the judge's statement of facts, Judge Mashburn responded:
 "I don't need that (transcripts of the three prior trials). I heard the evidence. I was convinced beyond a reasonable doubt when I heard the evidence that the man was guilty. The second time I heard it, I was convinced he was guilty. Now I'm trying cases everyday. Just because I didn't quote exactly the way the witnesses say it, I've quoted the substance of their testimony."
We find especially significant Judge Mashburn's comments in denying Anderson's motions following the third trial:
 "I'm faced in this thing — in as far as the mistrial, the State had nothing to do with the Court declaring a mistrial. The last time we were here on Easter weekend and that's the reason I kept them here late Friday night hoping they could get a verdict and I absolutely refused to discharge them until they convinced me that there was no possibility of their reaching a verdict no matter how long I kept them out there. The State made no motion for me to declare a mistrial. While the record doesn't reflect, if it doesn't, that I questioned them and was informed on more than one occasion in both trials that there was no possibility of their reaching a verdict and that I declared a mistrial because of that. As I say, being convinced as I am of the guilt of the defendant, I might be inclined to grant your motion if there was in my thinking any possibility of a jury finding this man not guilty. But I, for the life of me, I can't understand how reasonable people had any reasonable doubt of his guilt. For that reason, I'm going to deny your motion."
In each of his three trials and in this mandamus proceeding, Anderson is represented by the same court appointed counsel, Bill Clark. In responding to Mr. Clark's claim of "politics" in the continued prosecution of Anderson after the third mistrial, Judge Mashburn recognized the *Page 440 
competency of both the prosecutor and defense counsel:
 "I didn't believe that any lawyer could have done a better job than he (the prosecutor) did. I thought he did a good job and it was only the expertise of his opponent (defense counsel), I felt, that kept him from getting a conviction."
 II. THE FORMER JEOPARDY ISSUE
We conclude that the double jeopardy clauses of both the state and federal constitutions do not bar or prevent a fourth trial for the same offense where the three prior trials have ended in properly declared mistrials due to hung or deadlocked juries.
"The fountainhead decision construing the Double Jeopardy Clause in the context of a declaration of a mistrial over a defendant's objection is United States v. Perez, (22 U.S. 579) 9 Wheat. 579 [6 L.Ed. 165] (1824)." Illinois v. Somerville,410 U.S. 458, 461, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973).Perez held that the declaration of a mistrial because of the jury's inability to agree is not a bar to a subsequent trial for the same offense.
 "We are of opinion that the facts constitute no legal bar to a future trial. The prisoner has not been convicted or acquitted, and may again be put upon his defense. We think, that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the judges, under their oaths of office."
Perez, 22 U.S. (9 Wheat) at 580.
This passage sets out the standard to measure the propriety of a mistrial declared without the consent of the defendant.United States v. Jorn, 400 U.S. 470, 481, 91 S.Ct. 547, 555,27 L.Ed.2d 543 (1971).
In applying the Perez standard, our United States Supreme Court has described the "classic basis" for a "proper mistrial" as being the conclusion of the trial judge that a divided jury will be "unable to reach a verdict."
 "At the other extreme (from those cases wherein the mistrial is declared to allow the prosecutor to buttress weaknesses in his evidence) is the mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict, long considered the classic basis for a proper mistrial. The argument that a jury's inability to agree establishes reasonable doubt as to the defendant's guilt, and therefore requires acquittal, has been uniformly rejected in this country. Instead, without exception, the courts have held that the trial judge may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial. This rule accords recognition to society's interest in giving the prosecution one complete opportunity to convict those who have violated its laws."
 Arizona v. Washington, 434 U.S. 497, 509, 98 S.Ct. 824, 832, 54 L.Ed.2d 717 (1978).
A retrial following a mistrial because of a deadlocked jury does not normally give rise to a colorable claim of former jeopardy unless the trial judge has abused his discretion in declaring that mistrial. United States v. Ellis, 646 F.2d 132,135 (4th Cir. 1981). See also United States v. Brown,677 F.2d 26, 27 (6th Cir. 1982); United *Page 441 States v. Cawley, 630 F.2d 1345, 1348 (9th Cir. 1980).
In Willingham v. State, 50 Ala. App. 363, 279 So.2d 534, cert. denied, 291 Ala. 803, 279 So.2d 538 (1973), this Court held that a defendant was not placed in double jeopardy by a third prosecution for murder after his first two trials ended in mistrials because of the failure of the jury to reach a verdict. See also Clements v. State, 390 So.2d 1131
(Ala.Cr.App.), cert. denied, Ex parte Clements, 390 So.2d 1136
(Ala. 1980).
 "Section 9 of the Alabama Constitution of 1901 and Alabama Code Section 12-16-233 (1975) give the trial judge the authority and discretion to discharge a jury upon a failure to agree. Parham v. State, 285 Ala. 334, 231 So.2d 899 (1970); Parham v. State, 47 Ala. App. 76, 250 So.2d 613 (1971); Orr v. State, 40 Ala. App. 45, 111 So.2d 627 (1958), affirmed, 269 Ala. 176, 111 So.2d 639 (1959). A jury's inability to agree either on a verdict or punishment is a proper reason for the declaration of a mistrial. After such a mistrial, the retrial of the defendant is not barred by double jeopardy. Alford v. State, 243 Ala. 404, 10 So.2d 373 (1942); Curry v. State, 203 Ala. 239, 82 So. 489 (1919); Parker v. State, 51 Ala. App. 362, 285 So.2d 526, cert. denied, 291 Ala. 795, 285 So.2d 529 (1973); Willingham v. State, 50 Ala. App. 363, 279 So.2d 534, cert. denied, 291 Ala. 803, 279 So.2d 538 (1973); Powell v. State, 37 Ala. App. 192, 65 So.2d 718 (1953). `A mistrial is no trial.' Willingham, 50 Ala. App. at 366, 279 So.2d 534. When the jury fails to agree on a verdict, the whole proceeding is completely nullified and nothing remains which can benefit the defendant. Powell, 37 Ala. App. at 193, 65 So.2d 718."
Clements, 390 So.2d at 1132-33.
Some federal courts have indicated that there may be a "breaking point" at which double jeopardy will bar a reprosecution. Although United States v. Gunter, 546 F.2d 861,866 (10th Cir. 1976), held that a third prosecution after two hung juries was not barred, the court noted, "There indeed may be a breaking point, but we do not believe it was reached in the instant case." In Preston v. Blackledge, 332 F. Supp. 681,688 (E.D.N.C. 1971), it was held that a fifth trial following four hung juries went "beyond the allowed exceptions" of Perez
and violated the principles of the Double Jeopardy Clause. There, the court found an abuse of the State's right to retry the accused when the jury could not agree. The court, citingWade v. Hunter, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974
(1949), weighed "the public's interest in justice" against "the accused's right to be tried by a particular tribunal" and found that the accused's rights outweighed the demand for public justice. 332 F. Supp. at 686.
 "There is no doubt that such a practice (retrial after a jury has failed to reach a verdict) is oppressive, that it creates undue anxiety and insecurity, and that it enhances the possibility that an innocent man may be found guilty. Furthermore, this court feels that to try the petitioners five times is far beyond the allowed exceptions set forth in Perez, and also exceeds the limitations on the right to retry an accused subsequently set forth by our Supreme Court."
Preston, 332 F. Supp. at 688.
Although Preston v. Blackledge does support Anderson's argument, our attitude toward that case is the same as was expressed in United States v. Castellanos, 478 F.2d 749, 752, n. 2 (2d Cir. 1973), which dismissed Preston with the terse comment: "While we doubt the correctness of the case's reasoning, it is distinguishable from the one at hand on the basis of numbers, if nothing else." See also State v. Aillon,182 Conn. 124, 438 A.2d 30, 37, n. 8 (1980).
Although double jeopardy was held to have precluded a third trial of the accused in United States ex rel. Webb v. Court ofCommon Pleas, 516 F.2d 1034 (3rd Cir. 1975), the facts of that case show that the trial judge abused his discretion in declaring a mistrial. Where a mistrial is properly declared, double jeopardy does not bar a second trial. Arnold v.McCarthy, 566 F.2d 1377, 1386-88 (9th Cir. 1978). "(T)he *Page 442 
essential question in each case involving double jeopardy contentions after the declaration of a mistrial has been whether the trial judge abused his discretion in terminating the trial short of verdict. If so, retrial is barred." UnitedStates v. Castellanos, 478 F.2d 749, 751 (2nd Cir. 1973).
Upon the above authorities, we conclude that the Double Jeopardy Clause does not bar Anderson's retrial in this case.
 III
Necessarily included in our determination that another retrial following the mistrials does not give rise to a colorable claim of double jeopardy is a finding that the trial judges did not abuse their discretion in declaring the mistrials. Ellis, 646 F.2d at 135. In Part I of this opinion, we have set forth the known details surrounding the three mistrials.
Here, we find no abuse of the trial judges' discretion in declaring any of the three mistrials. While we may have allowed the jury to deliberate longer in at least one of the trials, that is not the criterion. "There is no minimum amount of time which a jury must spend in deliberations before a mistrial can be declared. This factor is one which is best left to the determination of the trial judge who was most aware of the circumstances of the trial." Arnold v. McCarthy, 566 F.2d 1377,1387 (9th Cir. 1978). We cannot find as a matter of law that any of the time periods involved constituted an unreasonably short time for a jury to reach a deadlock.
 "Also, the judge might have determined that requiring the jury to further deliberate could result in an unfair verdict. Coercion of an already exhausted jury to continue deliberations may induce jurors to accommodate a verdict which they would not otherwise support.
 "Such compulsion may have resulted in nothing more than needless waste of judicial resources and time if the jury was actually deadlocked. The record does not tell whether these considerations entered the mind of the trial judge, but their subtle presence in almost every case is additional reason to defer to the district judge's finding."
Arnold, 566 F.2d at 1387 (citations omitted).
We have reviewed "a number of significant factors which are useful in determining whether a judge has properly exercised his discretion to declare a deadlocked jury." Arnold, 566 F.2d at 1386.[1] The application of those factors to this case supports the trial judges' determinations that each of the three juries was hopelessly deadlocked. "(T)he trial court is in the the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate." Washington,434 U.S. at 510, n. 28, 98 S.Ct. at 832, n. 28.
 "Moreover, in this situation there are especially compelling reasons for allowing the trial judge to exercise broad discretion in deciding whether or not `manifest necessity' justifies a discharge of the jury. On the one hand, if he discharges the jury when further deliberations may produce a fair verdict, the defendant is deprived of his `valued right *Page 443 
to have his trial completed by a particular tribunal.' But if he fails to discharge a jury which is unable to reach a verdict after protracted and exhausting deliberations, there exists a significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors. If retrial of the defendant were barred whenever an appellate court views the `necessity' for a mistrial differently from the trial judge, there would be a danger that the latter, cognizant of the serious societal consequences of an erroneous ruling, would employ coercive means to break the apparent deadlock. Such a rule would frustrate the public interest in just judgments. The trial judge's decision to declare a mistrial when he considers the jury deadlocked is therefore accorded great deference by a reviewing court."
 Washington, 434 U.S. at 509-10, 98 S.Ct. at 832
(footnotes omitted).
See also Logan v. United States, 144 U.S. 263, 12 S.Ct. 617,36 L.Ed. 429 (1892).
In each instance, the record shows that the trial judge appropriately determined that there was a manifest necessity for a mistrial by questioning either the jury foreman or the entire jury. Cawley, 630 F.2d at 1349. Under the facts and circumstances of this case those determinations are due to be accorded deference.
 IV. THE DUE PROCESS ISSUE
Even though the Double Jeopardy Clause does not bar Anderson's retrial, he argues that another trial will violate his rights under the Due Process Clause. This is a valid argument, Castellanos, 478 F.2d at 753, n. 4, although we reject its application under the circumstances of this case.
Some courts have recognized that, even though reprosecution is not barred by double jeopardy, the trial judge has "inherent authority to terminate a prosecution" where previous trials have resulted in deadlocked juries. Annot. 4 A.L.R.4th 1274, 1283 (1981). In support of his argument, Anderson relies onUnited States v. Ingram, 412 F. Supp. 384 (D.D.C. 1976); Statev. Moriwake, 647 P.2d 705 (Hawaii 1982); State v. Witt,572 S.W.2d 913 (Tenn. 1978); and People v. Kirby, 112 Misc.2d 906,447 N.Y.S.2d 606 (1982). In each of these cases the trialjudge's dismissal of the indictment after mistrials because of the jury's failure to agree was upheld on appeal — not under the Double Jeopardy Clause but under principles of due process. Each of these cases is distinguishable from the present one because they involve a review of a trial judge's finding that justice demanded that further prosecution be terminated.
In Ingram, the court noted that it was "simply a matter of fair play" and held that "(t)o permit (a third) retrial, after 21 of 24 jurors have already refused to convict, is to ignore the reasonable doubt standard." 412 F. Supp. at 385-86. The district court felt that "the Government, always a hard loser, simply wishes to keep pressing so long as juries disagree in the hope that a conviction eventually will result."412 F. Supp. at 385. Weighing the government's inability to convince a jury against "the strain on defendant, the burden on inadequately compensated defense counsel, the inconvenience to the . . . (witnesses), and the urgency of the more significant court business subject to priority demands", the district court found that its intervention was required in "the interests of justice." 412 F. Supp. at 386.
In Moriwake, the court held that a trial judge had the inherent judicial power to "sua sponte dismiss an indictment with prejudice following the declaration of one or more mistrials because of genuinely deadlocked juries, even though the defendant's constitutional rights are not yet implicated." 647 P.2d at 712. However, the court recognized that a third or even more trials may be appropriate "in certain circumstances." 647 P.2d at 713.
Witt, which was followed in Moriwake, specifically rejected the application of the constitutional ground of double jeopardy and held that "trial judges have the inherent authority to terminate a prosecution in *Page 444 
the exercise of a sound judicial discretion where, . . . repeated trials, free of prejudicial error, have resulted in genuinely deadlocked juries and where it appears that at future trials substantially the same evidence will be presented and that the probability of continued hung juries is great." 572 S.W.2d at 917. The Tennessee Supreme Court emphasized that "the trial judge made a finding, . . . supported by opinions of jurors who had heard the evidence and participated in deliberations seeking to reach a verdict, that the probability of any future jury reaching a verdict of guilt or innocence is almost nonexistent." 572 S.W.2d at 916-17. However, even Witt
recognized that the propriety of the trial judge's dismissal of the indictment must be determined within the particular facts and circumstances of each case and the rights of the accused must be balanced against the public interest in justice without the "`mechanical application of an abstract formula' that the cases condemn." 572 S.W.2d at 916.
In Kirby, the trial court dismissed the indictment after the defendant's three trials had each resulted in a mistrial. The court recognized that trial courts "must have the discretion, . . . to prohibit further prosecution where it appears that a just verdict, or any verdict, is unattainable." 447 N.Y.S.2d at 610. There, the trial judge was of the opinion that there was "little likelihood that any jury would in the future reach unanimous agreement as to the charges." He found that "the fatal flaw in the prosecution's case is, . . . the credibility of the prosecution's principal witness." 447 N.Y.S.2d at 607.Kirby also recognized that there is no magic number of mistrials to which an accused must be subjected before further prosecution is constitutionally impermissible.
 "This opinion is not to be construed as fixing the permissible or impermissible number of mistrials caused by deadlocked juries. The relevant principles must be applied on an ad hoc basis. The court is not announcing a per se rule or applying a formula mechanically. The sound judicial discretion of a trial judge to terminate a criminal prosecution is a power that ought to be used with the utmost caution and then only where the circumstances clearly justify such action."
Kirby, 447 N.Y.S.2d at 610.
We fully recognize and adhere to the principle that to allow the State repeated opportunities to convict an individual may unfairly shift the constitutional scheme of the criminal justice system. Green v. United States, 355 U.S. 184, 187,78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957); Note: Mistrials AndDouble Jeopardy, 15 Amer.Crim.L.Rev. 169, 190 (1977). However, "a mechanical rule prohibiting retrial whenever circumstances compel the discharge of a jury . . . would be too high a price to pay for the added assurance of personal security and freedom from governmental harassment which such a mechanical rule would provide." United States v. Jorn, 400 U.S. 470, 480,91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971). Each case must turn on its own particular facts and circumstances. Arnold v. State,563 S.W.2d 792 (Tenn.Cr.App. 1977).
A number of factors have been suggested for consideration in determining the propriety of retrial following a mistrial. Schulhofer, Jeopardy And Mistrials, 125 U.Pa.L.Rev. 449, 493-507 (1977).
 "Simply put, `(i)t is a matter of balancing the interest of the state against fundamental fairness to a defendant with the added ingredient of the orderly functioning of the court system.' State v. Braunsdorf, supra [98 Wis.2d 569], 297 N.W.2d [808] at 817. The factors which the trial court should consider in undertaking. this balance include the following: (1) the severity of the offense charged; (2) the number of prior mistrials and the circumstances of the jury deliberation therein, so far as is known; (3) the character of prior trials in terms of length, complexity and similarity of evidence presented; (4) the likelihood of any substantial difference in a subsequent trial, if allowed; (5) the trial court's own evaluation *Page 445 
of relative case strength; and (6) the professional conduct and diligence of respective counsel, particularly that of the prosecuting attorney." Moriwake, 647 P.2d at 712-13 (considerations for the trial judge in sua sponte dismissing an indictment with prejudice following the declaration of one or more mistrials because of genuinely deadlocked juries).
See also State v. Lundeen, 297 N.W.2d 232, 236 (Iowa App. 1980).
In finding that the Due Process Clause does not prevent Anderson's fourth trial, we have carefully weighed and considered each of these factors, which we attempted to set out in Part I of this opinion. We find that reprosecution will not cause Anderson any substantial and specifically identifiable prejudice.
The harm resulting from the delay caused by mistrial and reprosecution is minimal, as will be the personal strain of another trial, Green, 355 U.S. at 187-88, 78 S.Ct. at 223, because Anderson has been and remains incarcerated within the Alabama Prison System serving a sentence for robbery. There is no evidence that the strain and expense of a fourth trial will hamper Anderson's chances for an acquittal. Anderson continues to be represented by the same appointed counsel. In balancing all the factors involved, we have considered the inconvenience to both counsel and witnesses which a fourth trial will entail. Although we fully recognize the hardship imposed on appointed counsel by Anderson's continued prosecution, we do not consider that inconvenience paramount in deciding the issue before us, but only one of several important factors to consider.
There is no evidence that either deliberate governmental misconduct is involved in any of the mistrials or that the repeated prosecutions are the result of deliberate harassment by a prosecutor whose evidence is weak and insufficient. We see no unilateral advantage that the State will gain in reprosecuting Anderson. Implicit in Judge Mashburn's rulings and comments is a finding that the State's case is not fraught with inherent weaknesses of probative evidence or insufficient to present a prima facie case.
We recognize that a mistrial due to the inability of the jury to agree upon a verdict "involves acute possibilities for prejudice to the defendant." Schulhofer at 522. Yet, we weigh more heavily in this case the public's right to justice and both the State's and the defendant's right to a final determination of the accusation. A contrary ruling under the circumstances we have described would "subvert the public interest and permit a person, however guilty of serious crimes against society, to walk away unadjudicated, thereby reducing the detriment of punishment by increasing in a large measure the probabilities of escaping it." People v. Baker, 70 Misc.2d 986,335 N.Y.S.2d 487, 492 (1972). This principle is especially compelling here for two reasons. First, the nature of the particular crime committed is significant here because not only is it so serious as to be classified as a capital offense and merit the death penalty, but also because it involves the murder of a uniformed police officer in the performance of his official duty. Few crimes so tear at the very fabric of our criminal justice system as does the intentional killing of one charged with and actively engaged in enforcing the law.
Second, the trial judge's finding that he could not "understand how reasonable people had any reasonable doubt of his guilt" stands in stark contrast to every case Anderson cites on his behalf. If for no other reason, this fact alone distinguishes and differentiates every other case we have reviewed in seeking a just answer to the questions Anderson presents to this Court.
The petition for writ of mandamus is denied.
WRIT DENIED.
TYSON, SAM TAYLOR and HUBERT TAYLOR, JJ., concur.
HARRIS, J., not sitting.
[1] Those factors include:
 "(1) a timely objection by defendant, (2) the jury's collective opinion that it cannot agree, (3) the length of the deliberations of the jury, (4) the length of the trial, (5) the complexity of the issues presented to the jury, (6) any proper communications which the judge has had with the jury, and (7) the effects of possible exhaustion and the impact which coercion of further deliberations might have on the verdict."
Arnold, 566 F.2d at 1387.
 See also Rogers v. United States, 609 F.2d 1315, 1317
(9th Cir. 1979):
 "(F)actors to be considered by the judge include the jury's collective opinion that it cannot agree, the length of the trial and complexity of the issues, the length of time the jury has deliberated, whether the defendant has made a timely objection to the mistrial, and the effects of exhaustion or coercion on the jury."
 "The most critical factor is the jury's own statement that it is unable to reach a verdict." United States v. Cawley, 630 F.2d 1345, 1349 (9th Cir. 1980). *Page 446