John Norman Firth was indicted for the "unlawful disposal of a waste without a permit," in violation of § 22-22-14, Code of Alabama 1975. The jury found the appellant "guilty as charged in the indictment." The appellant was sentenced to one year imprisonment, six months suspended, and fined $18,000.
Michael Anthony Jones testified that between October of 1982 and October of 1983, he was employed by Petro-Chem Services, Incorporated. The appellant was the president of this company during this time. Jones's job was to drive trucks and clean tanks and barges. The barges were located at a site at the port of Chickasaw on Chickasaw Creek in Mobile County. The company handled drilling mud, a by-product of a drilling rig owned by Superior Oil in Mount Vernon. The drilling mud would be transported from Mount Vernon to Chickasaw in small barges and then transferred to larger barges in Chickasaw.
The company received some equipment, termed "mud doctors," at this Chickasaw site. The equipment is designed to take 95 percent of the water out of the drilling mud *Page 399 
so that the mud can then be hauled in trucks to a landfill. The "mud doctors" did not work and Jones was told to clean up the equipment. Jones washed the equipment and the mud ran into the creek.
In April of 1983, Jones was told to dump some drilling mud into Chickasaw Creek. It was raining hard that day. That afternoon, the appellant came out to the site where the dumping was in progress. The appellant told Jones they were "doing a good job" and to "keep the work up." (R. 30) The appellant then walked to his car and got a couple of bottles of Joy detergent and walked back to the edge of Chickasaw Creek where there was a light film on top of the water. The appellant squirted the detergent into the water and the film disappeared. He then said, "[N]ext time you see that film, just take this Joy and squirt it on there and we won't have nothing to worry about, and nobody can see any evidence. . . ." (R. 31) Jones pumped drilling mud on a couple of other occasions when it was raining hard because the mud from the rain would cover up the drilling mud.
In June of 1983, Jones had a conversation with the appellant. Also present were his brother, Brett Jones, Brian Holderfield and Pete Crolich. At this time, the Chickasaw site had been closed and all of the equipment was no longer there. Two trucks from Louisiana had been brought over by the company and the appellant told Jones to take one of the trucks out to Chickasaw and see if it would pump the drilling mud out of the barges into the truck.
Jones did this and he told the appellant that the truck would pump the mud. Jones was then told to go out to the site and pump the mud into the creek.
The next night, Jones went out to Chickasaw Creek with his brother and Crolich. They put one end of a hose in the drilling mud in the barges and hooked the other end of the hose to the truck. The truck then pumped the mud into the truck. They then put one end of the hose into the creek and pumped the mud from the truck into the creek. Four truckloads of drilling mud were discharged into the creek that night. A truckload is 80 barrels. A barrel is 42 gallons.
The next two nights the same process was repeated. Brian Holderfield was also present on these occasions. During those two nights, 16 truckloads of drilling mud were discharged into the creek.
Jones quit his job in October of 1983 because his paychecks were no good. He was contacted by the State in regard to the discharge in the early part of 1984. He contacted Holderfield concerning this matter because the State asked him to get in touch with persons who were present when the discharge took place.
Jones stated that he wanted to "get" the appellant because he had not received his money from his paychecks. Jones also contacted Sam Tate and Doug Christopher to help "get" the appellant.
Brett Jones and Brian Holderfield testified to basically the same facts of the June discharges as Michael Jones had.
Gary Allen, an environmental investigator with the Department of Environmental Management, testified that, after talking with the Jones brothers and Holderfield, he went to the Chickasaw Creek site and took samples of the creek bottom. On February 6, 1984, Allen took six samples of the creek bottom in the immediate area where the discharging allegedly occurred. On February 9, 1984, Allen took three more samples of the creek bottom, one upstream, one downstream and one across the bank from the discharge site. He then took these samples to Montgomery to be analyzed. The samples were analyzed by Charles Sellers, a chemist with the Alabama Department of Environmental Management.
The samples were analyzed for barium, a component of drilling mud. Allen testified that barium is an element that occurs naturally in the environment. The normal level of barium for the Chickasaw Creek would be less than 100 parts per million.
The results of the six samples taken on February 6 where the discharge allegedly occurred were (all in parts per million): (1) *Page 400 
1,070; (2) 1,350; (3) 2,300; (4) 1,800; (5) 2,100; (6) 1,600. All of these samples were significantly above the normal barium content of the Chickasaw Creek. The barium content of the upstream, downstream, and across the bank samples were, respectively (all in parts per million), 60, 213, 28.
Allen testified that barium is a heavy element and when discharged into the water, it would sink almost directly to the bottom. This is the reason that the six samples were significantly higher in barium content than were the other three samples. The upstream and across the bank samples revealed a barium content level consistent with the normal levels for the area, which were established by a coastal area board study. The higher barium content of the downstream samples was most likely due to small concentrations of barium being carried downstream by the current before they settled to the bottom.
Allen was shown a copy of a letter written by John C. Carlton, supervisor of the Mobile Field Office of the Alabama Department of Environmental Management. The letter referred to two samples of the Chickasaw Creek site which were taken at the direction of the ADEM on August 8, 1983. The two samples revealed a barium content of 694 and 151. (95 parts per million.) While Allen admitted that there was a possibility that someone could have added barium to the water after August of 1983, he explained the discrepancy was probably due to the fact that the samples were randomly taken. He stated that, in his opinion, nine samples would be more representative of the actual barium content than would two samples.
Allen testified that a permit must be obtained to discharge anything into the waters of Alabama. To his knowledge, Petro-Chem Services did not have a permit to discharge anything into Chickasaw Creek. Further, he testified that a permit to discharge drilling mud cannot be obtained because it is not allowed.
Allen also testified that he visited the Chickasaw site after it had been closed by Petro-Chem Services. At that time, he observed drilling mud in the barges located at the site.
George Crozier, the director of the Dauphin Island Sea Lab, testified about a study conducted by the Coastal Area Board. The study revealed that the lowest values of barium found in the Mobile Bay area was 10 parts per million, while the highest values were 640 parts per million. The location of the 640 samples was at the site of a drilling mud spill. The average barium content for the area was 37 parts per million.
Crozier stated that the results of the six samples taken by Allen at the Chickasaw site are exceedingly high compared to the barium values included in the Coastal Area Board study. Those results are consistent with the discharge of drilling mud. A barium content of over 100 parts per million indicates something has been added to the natural environment.
Crozier was also shown the results of the August 1983 samples. He explained the discrepancies between the August and February samples could have been caused by the fact that when barium sinks to the bottom it does not evenly coat the floor of the creek bottom. The closer to the discharge site a sample is taken the higher the concentration of barium.
Charles Horn, the acting director of the water division of the ADEM, testified that Petro-Chem Services did not have a permit to discharge drilling mud into Chickasaw Creek.
Caldwell Hurdle employed Michael and Brett Jones in the fall of 1983. Brett Jones was upset because the appellant had not paid him and he told Hurdle that he would get his money from the appellant "one way or the other." (R. 188)
Sam Tate testified that he was employed by Petro-Chem Services during the period in question. In January of 1983, the Chickasaw site was closed and all of the equipment was brought to the warehouse in Prichard.
Tate stated that he was in charge of all the equipment in the warehouse and lived *Page 401 
on the premises. To check out equipment, employees had to come to him and he would then clear it with the appellant. Tate testified that no trucks were ever used overnight.
He said that the company did have two 80 barrel trucks during the time in question. However, he testified that they would not be able to suck up drilling mud because they were only designed for pumping water slush.
Tate testified that Michael Jones called him about going to the EPA about the appellant. Jones said he wanted to get his money. Tate denied any knowledge of the discharge of drilling mud into Chickasaw Creek. He is still employed by the appellant.
Jerome Agee testified that he secured the Chickasaw site with sandbags to prevent the runoff of drilling mud into the creek.
Russell Myles testified that he operated A A Marine Services at the Chickasaw site from 1975 to 1979. During that period, his company transported drilling mud from that site. Myles stated that drilling mud was never spilled during this time and the bottom of the creek at the site was dredged before the company moved.
Harry Howell, a microbiologist for Micro-Methods Laboratories, testified that he took samples of the Chickasaw Creek bottom at the site in question on March 25, 1985. His samples revealed the following barium content: (in parts per million) (1) 377; (2) 358; (3) 685; (4) 261; (5) 349; (6) 357. An upstream sample revealed a 6.1 parts per million barium level. A sample taken across the bank revealed a 3.3 parts per million barium content. Another sample revealed a 30 parts per million barium content.
The results of his samples lead him to the conclusion that the site is contaminated with barium. Howell stated it is not unusual to have variances in number when taking sediment samples.
Pete Gotcher, an investor in Petro-Chem Services, testified that he and the appellant were business partners. He stated that the Chickasaw site had been vacated in February of 1983. By that time all of the drilling mud had been shipped to Texas or Louisiana.
 I
Prior to the trial of this case, the following occurred:
 "MR. KIMBROUGH: I'm ready subject to the call of my witnesses. Captain Leach, I think, is at sea. He was a defense witness last time. He was a witness who was present during the entire time that these acts were alleged to have taken place.
 "THE COURT: Mr. Kimbrough, don't you think it a little inconsiderate of you to wait till the morning of trial to make that motion?
 "MR. KIMBROUGH: I didn't know where Captain Leach was, Your Honor.
 "THE COURT: You just got through telling me he's been at sea for months.
"MR. KIMBROUGH: That's what Pete Colich just told me.
 "MR. CROLICH: I just found this out, Your Honor, that he was at sea.
"THE COURT: Do you oppose a continuance, Mr. Valeska?
"MR. VALESKA: Yes, sir, Judge.
"THE COURT: I'm going to deny it.
 "MR. KIMBROUGH: I except to the Court's ruling." (R. 4)
The appellant now contends the trial judge's denial of his motion for a continuance based on Captain Leach's unavailability was error.
 "The constitutional right of the accused to have compulsory process to obtain witnesses in his defense is well established. See, e.g. Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); United States v. Melchor Moreno, 536 F.2d 1042 (5th Cir. 1976). Holding this Sixth Amendment right to be applicable in state proceedings, the Supreme Court in Washington noted:
 "The right to offer testimony of witnesses, and to compel their attendance, *Page 402 
if necessary, is in plain terms the right to present a defense. . . . This right is a fundamental element of due process of law.
"388 U.S. at 18, 87 S.Ct. at 1923.
 "Not every denial of a motion for continuance to obtain witnesses violates the accused's right to compulsory process. See, e.g., McKinney v. Wainwright, 488 F.2d 28 (5th Cir.), cert. denied, 416 U.S. 973, 94 S.Ct. 1998, 40 L.Ed.2d 562 (1974). A court may not, however, refuse to grant a reasonable continuance for the purpose of obtaining defense witnesses where it has been shown that the desired testimony would be relevant and material to the defense. Hicks v. Wainwright, 633 F.2d 1146 (5th Cir. 1981); Singleton v. Lefkowitz, 583 F.2d 618 (2d Cir. 1978). In Hicks this Court recently enunciated several factors which are to be considered in determining whether an accused was deprived of his right to compulsory process by a denial of a motion for continuance:
 "[T]he diligence of the defense in interviewing witnesses and procuring their presence, the probability of procuring their testimony within a reasonable time, the specificity with which the defense is able to describe their expected knowledge or testimony, the degree to which such testimony is expected to be favorable to the accused, and the unique or cumulative nature of the testimony.
 "633 F.2d at 1149 (quoting United States v. Uptain, 531 F.2d 1281, 1287 (5th Cir. 1976) (footnotes omitted))."
Dickerson v. Alabama, 667 F.2d 1364, 1369-70 (11th Cir. 1982);Dale v. State, 466 So.2d 196 (Ala.Cr.App. 1985).
Our examination of the factors enumerated above, in relation to the case at bar, leads us to the conclusion that the appellant's constitutional rights were not violated by the trial judge's failure to grant a continuance. Dale, supra.
It is obvious from the portion of the transcript previously quoted that defense counsel did not use due diligence in his attempt to procure Leach's presence at trial. Surely defense counsel was aware that the case was coming to trial but he did not even attempt to ascertain Leach's whereabouts until the morning of the appellant's trial. Certainly, if defense counsel was unable to locate Leach, he could have apprised the trial judge of this fact prior to the morning of the trial.
It is doubtful, according to the record, whether Leach could have been located within a reasonable time. As the appellant states in brief at page 11, "[d]ue to Captain Leach's occupation, he is out at sea for several months at a time." Defense counsel gave the court no indication that Leach could be brought to testify in a reasonable length of time.
There is nothing contained in the record that indicates defense counsel described to the court, with specificity or by any other manner, the expected testimony of Leach. The only evidence in the record that Leach's testimony would be favorable to the appellant is a statement by defense counsel that Leach was a defense witness in the appellant's previous trial. Further, the record is devoid of evidence of the unique nature of Leach's testimony.
Moreover, the record indicates that defense counsel was shown a copy of Leach's testimony at the first trial. This could have been used as a substitute for Leach's testimony at this trial.Thompson v. State, 473 So.2d 1205 (Ala.Cr.App. 1985).
Therefore, the trial judge did not abuse its discretion in denying appellant's motion for a continuance.
 II
In the appellant's motion for discovery, he requested all "evidence reflecting adversely on the credibility of any prosecution witness." (C.R. 8)
The following is an excerpt from the transcript during the cross-examination of State's witness, Brett Jones, by defense counsel:
 "Q Have they made any promise not to make any charge against you? *Page 403 
"A Yes, sir.
 "Q And if you come in here and testify, is that what the agreement was that you testify against Norman, you won't be charged?
"A Yes, sir.
"Q Did they put that in writing?
"A No, sir.
"Q What else did they tell you about that?
"A As far as what?
"Q About not bringing any charges against you.
"A That was it.
 "Q They said if you'll testify against Norman, we won't bring any charges against you?
"A Basically.
"Q Who made that statement?
"A Gary Allen.
"Q Mr. Allen made that statement?
"A I think so.
"MR. KIMBROUGH: That's all." (R. 59)
The appellant contends that the failure of the prosecution to disclose this promise of immunity to Brett Jones violates Bradyv. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). "It is now clear that Brady imposes an affirmative duty on the prosecution to produce at the appropriate time the requested evidence which is materially favorable to the accused either as direct or impeaching evidence." Williams v. Dutton,400 F.2d 797 (5th Cir. 1968).
A promise of immunity to Brett Jones would be relevant to his credibility as a witness and if such a promise was made its existence should have been disclosed to defense counsel per his request. However, this court is not prepared to say that such a promise was, in fact, made to Brett Jones or any other prosecution witness. Gary Allen, the person who allegedly promised Brett Jones immunity, denied that he ever told Brett or Mike Jones that they would not be charged with any crime. He further stated that he had no authority to make such a promise.
The existence of a promise of immunity as to Brett Jones has not been proved to our satisfaction. Thus, we cannot hold the prosecution at fault for failing to disclose a promise of immunity which, in fact, was never made.
The appellant, in his brief, relies on Giglio v. UnitedStates, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) as authority for a reversal of this case. However, there is a glaring distinction between Giglio, supra, and the case at bar. In Giglio, supra, one of the assistant United States attorneys admitted he had promised leniency to a key government witness. Such was not the case in this cause.
Furthermore, the jury heard Brett Jones testify that he had been promised immunity. Therefore, even if we had found a promise of immunity had been made to Brett Jones, the appellant would not have been prejudiced by its nondisclosure by the prosecution. United States v. Walker, 720 F.2d 1527 (11th Cir. 1983), cert. denied, 465 U.S. 1108, 104 S.Ct. 1614,80 L.Ed.2d 143 (1984).
The appellant's motion for a mistrial was properly denied.
 III
Test results of two samples of the bottom of Chickasaw Creek which were made in August, 1983, were introduced into evidence. These test results indicated that the barium content of the creek was above normal levels. Further, test results of six samples of the bottom of Chickasaw Creek, which were made in February, 1984, were admitted into evidence. These results indicated that the barium content of the creek was above normal levels and were significantly higher than the results of the August, 1983, samples.
The appellant contends that the results of the February, 1984, samples were improperly admitted into evidence because the site where the samples were taken was not secured from August of 1983 until February of 1984. *Page 404 
It is evident from the record that this site was not secured from August, 1983, until February, 1984. However, the fact that the site was not secured does not make the results of the February tests inadmissible.
 "There must be similarity of conditions and circumstances at the time of a test as compared to the time of the event charged for the results of such test to have sufficient probative value for admission into evidence. It is for the court to determine whether conditions are sufficiently similar to warrant admission of such evidence. Much is left to the discretion of the trial court. Louisville Nashville R. Co. v. Sullivan, 244 Ala. 485, 13 So.2d 877, Norton Co. v. Harrelson, 278 Ala. 85, 176 So.2d 18."
Burgess Mining and Construction Corporation v. State ex relBaxley, 55 Ala. App. 61, 312 So.2d 842, 847, cert. denied,294 Ala. 16, 310 So.2d 872 (1975) (case wherein trial judge refused to allow the admission of the results of water sample tests into evidence because the conditions at the time of the test samples were far different than they were during the period when the alleged water pollution occurred).
 "Considerable weight must be accorded his conclusions that the requirement of substantial similarity has been met and that such dissimilarity as does exists, and the remoteness in time of the observation, are factors going to the weight of such evidence and not its competency. See Louisville Nashville R. Co. v. Sullivan, 244 Ala. 485, 13 So.2d 877."
Birmingham Electric Company v. Woodward, 33 Ala. App. 526,35 So.2d 369, 372 (1948).
Furthermore,
 "Conditions which are likely to remain the same until subsequent examination have been held admissible without such preliminary evidence in Alabama. Louisville N.R. Co. v. Lowe, 158 Ala. 391, 48 So. 99; Jackson Lumber Co. v. Cunningham, Adm'r, 141 Ala. 206, 37 So. 445."
Alabama Power Company v. Owens, 236 Ala. 96, 181 So. 283, 286
(1938).
Two of the State's witnesses adequately explained reasons for the differences in the test results of the samples taken in August, 1983. Even a defense witness testified that variances often occur when sediment samples are taken. Based on this evidence and the authorities cited above, we find that the trial judge did not abuse his discretion in admitting the February, 1984, results into evidence.
In fact, the appellant was allowed to admit into evidence results of samples taken in March of 1985. These results were also higher in barium content than the normal levels.
Therefore, even had we found the admission of the February tests to be error, it would have been harmless. The jury was made aware of the fact that the site was not secured between August of 1983 and February of 1984. Two witnesses told the jury that there was a possibility that the higher barium content of the February samples may have been caused by another party discharging barium into the creek. Further, the August test results also revealed higher than normal barium content levels as did the March test results introduced by the appellant.
There is no basis for reversal here.
 IV
The appellant contends the trial judge erred to reversal by allowing the indictment to be amended without his consent, in violation of § 15-8-90, Code of Alabama 1975.
The appellant and Pete Crolich were jointly charged in one indictment. Crolich pled guilty to the charges in the indictment prior to the appellant's trial. At the start of the appellant's trial, the trial judge simply deleted all references to Crolich in the indictment. As the State asserts in its brief, the indictment was not amended in this instance. The references in the indictment as to Crolich were merely omitted due to the fact that Crolich had earlier pled *Page 405 
guilty. Furthermore, defense counsel, during the course of the trial, repeatedly objected to testimony concerning Crolich. Therefore, the indictment in this case was not improperly amended.
The appellant also asserts that the indictment was due to be dismissed because "there is no allegation as to the time that the alleged violation occurred." (Appellant's brief, p. 20) Section 15-8-30, Code of Alabama 1975, states that it is unnecessary to allege in the indictment the precise time when an offense was committed.
The appellant was sufficiently apprised in the indictment of the charges against him as required by § 15-8-25, Code of Alabama 1975.
For the reasons stated above, this cause is due to be, and is hereby, affirmed.
AFFIRMED.
All the Judges concur.