[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 294 
The appellant was indicted for the capital offense of murder of a law enforcement officer, in violation of § 13-11-2(a)(5) (repealed), Code of Alabama (1975). The appellant was tried on three occasions, twice in 1981 and once in 1983; those trials ended in mistrials because the jury was unable to reach a verdict. Prior to a fourth trial, the appellant filed a petition for a writ of mandamus, claiming that a fourth trial would violate his due process rights and double jeopardy. This court denied the petition and that decision was affirmed by the Alabama Supreme Court. Ex parte Anderson, 457 So.2d 435
(Ala.Cr.App.), affirmed, 457 So.2d 446 (Ala. 1984). Following his fourth trial, the appellant was found guilty as charged in the indictment. The jury was unable to reach a verdict on the sentence and, pursuant to Beck v. State, 396 So.2d 645, 663
(Ala. 1980), the trial court sentenced the appellant to life without parole.
Jill Tapscott, an employee of Jefferson Federal Savings and Loan Association, testified that on November 29, 1979, she observed a black man standing in the building holding a gun. She described the man as approximately 6 feet tall, weighing 180 pounds, wearing "a brown leather hat with a little visor and a light weight wool sweater with blue and white stripes going across the chest"; he was also wearing a jacket. The man had a mustache. Ms. Tapscott identified two of the State's exhibits as the pistol and the sweater that the man was wearing. She further testified that the man took money and American Express travelers checks and put them in a paper bag and left the bank. She identified the *Page 295 
appellant as the man who robbed the Jefferson Federal Savings and Loan Association.
After the perpetrator left the bank, one of the employees pulled an alarm that is connected to the Birmingham Police Department. The officer who responded to the call broadcast a description of the man over his radio. Records of the police department indicated that this "robbery-in-progress" broadcast was made at 3:34 p.m.
Sergeant Albert Eugene Ballard, the victim, was in uniform on the day in question. Shortly after the broadcast concerning the robbery in progress, Sergeant Ballard had a conversation with another officer by radio. A witness, who was standing with her husband in the vicinity of the bank in downtown Birmingham, testified that she observed a police car, with one officer in the car, drive by slowly. A black man, who was tall and wore a long coat which was either black or dark brown, walked out to the police car. The man was carrying a yellow Pizitz bag, and he leaned into the car. She testified that she then heard three shots and observed the man whirl around with a gun. The police car took off as if the policeman's foot had hit the accelerator and the car hit a paper stand and a trash can on the corner. Another witness testified that she observed the officer in the police car call the man over to his car. She testified that the man reached into a bundle which he was carrying and pulled something out. She said that she then heard three shots and saw the man ran down an alley. She testified that the police car then ran into a utility pole and stopped. On cross-examination, she testified that the appellant looked like the man that she saw. The police records showed that a radio transmission was made at 3:49 which stated, in substance, "Oh me, 200 block. I'm hit bad. Lord, help me. 200 block 19th Street."
Officer Charles Newfield testified that in response to the radio descriptions that he had heard, he was looking for a black man, 6 feet to 6 feet 1 inch tall with a stocky build, wearing a three-quarter length brown coat and a brown hat. He observed a man fitting that description coming out of an alley; he therefore began to follow him. Newfield broadcast his movements to police headquarters and stated that the man continued walking in a calm manner, occasionally glancing in Newfield's direction. The man was carrying a yellow sack. The man rounded a corner and Newfield cut through a breezeway by the Southern Motor Inn. Newfield next saw the man lying in the parking lot of the Southern Motor Inn with gunshot wounds. He identified the appellant as the man he had seen. Approximately six other police officers were involved in the apprehension of the appellant. The appellant was ordered to stop, but did not do so. He was observed pulling something from his bag or his belt, as he was being pursued by the police officers. Gunfire was exchanged and the appellant was apparently shot in the face and the stomach. Articles of the appellant's clothing, rolls of coins taken from the appellant's pockets, a total of $2,058 in currency, and $13,300 in travelers checks were recovered from the scene. Two experts testified that they believed that the bullets found in Sergeant Ballard's body and his car were fired from the pistol taken from the appellant. Sergeant Ballard died as the result of three gunshot wounds.
 I
The appellant complains that he was convicted solely on the basis of circumstantial evidence and that this evidence failed to exclude every reasonable hypothesis except that of the guilt of the appellant.
 " 'In reviewing the sufficiency of the evidence the appellate courts of this State are bound by several well settled rules. It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt and to a moral certainty. Instead, the function of this Court is to determine whether there is legal evidence from which a jury could by fair inference find the defendant guilty. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.), cert. denied, 368 So.2d 877 (Ala. 1979); Scruggs v. State, *Page 296 359 So.2d 836, 842 (Ala.Cr.App.), cert. denied, 359 So.2d 843 (Ala. 1978).
 " 'In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State and accord the State all legitimate inferences therefrom. Ellis v. State, 338 So.2d 428
(Ala.Cr.App. 1976); Edson v. State, 53 Ala. App. 460, 301 So.2d 226 (1974). The evidence must be considered in the light most favorable to the prosecution. Colston v. State, 57 Ala. App. 4, 325 So.2d 520, cert. denied, 295 Ala. 398, 325 So.2d 531 (1975).
 " 'Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict. Bell v. State, 339 So.2d 96
(Ala.Cr.App. 1976). A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust. Bridges v. State, 284 Ala. 412, 225 So.2d 821 (1969); Morton v. State, 338 So.2d 423
(Ala.Cr.App. 1976). There is a presumption in favor of the correctness of a jury's verdict, and when the trial judge declines to grant a new trial that verdict is strengthened on appeal. Tolliver v. State, 50 Ala. App. 654, 658, 282 So.2d 92 (1973).' "
Freeman v. State, 505 So.2d 1079 (Ala.Cr.App. 1986), quotingJohnson v. State, 378 So.2d 1164, 1169 (Ala.Cr.App. 1979), writ quashed by Ex parte Johnson, 378 So.2d 1173 (Ala. 1979).
The appellant argues that some of the testimony presented by the eyewitnesses to the murder conflicted and that none of these witnesses testified that they saw a gun. However, during the direct examination of Mildred Wilkins, the following transpired:
 "WILKINS: And the next thing I know I heard three shots.
 "Q: Did you see anybody out there with a gun when you heard what you described as three shots?
 "WILKINS: The guy whirled around with the gun in his hand."
Furthermore, the appellant's claims are jury arguments concerning witness credibility and do not address the legal sufficiency of the evidence. Jones v. State, 469 So.2d 713, 716
(Ala.Cr.App. 1985). "The weight of the evidence, the credibility of the witnesses, and inferences to be drawn from the evidence, where susceptible of more than one rational conclusion, are for the jury alone. Willcutt v. State, 284 Ala. 547, 226 So.2d 328
(1969)." Walker v. State, 416 So.2d 1083, 1089
(Ala.Cr.App. 1982). In reviewing a conviction based on circumstantial evidence, the test to be applied by this court is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether the evidence excludes every reasonable hypothesis except guilt. Cumbo v. State, 368 So.2d 871, 874
(Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979). Based on the evidence presented by the State, a jury could have reasonably concluded that every reasonable hypothesis except guilt was eliminated.
 II
The appellant argues that his conviction in his fourth trial, following three mistrials, should be barred on the basis of double jeopardy. This issue has already been decided adversely to the appellant by the Alabama Supreme Court in Ex parteAnderson, 457 So.2d 446 (Ala. 1984):
 "In Clements v. State, 390 So.2d 1131, 1132
(Ala.Crim.App.), cert. denied, Ex parte Clements, 390 So.2d 1136 (Ala. 1980), the court held that 'a jury's inability to agree either on a verdict or punishment is a proper reason for the declaration of a mistrial. After such a mistrial, the retrial of the defendant is not barred by double jeopardy.' (Citations omitted.) It has also been held in Alabama that a 'mistrial is no trial' and, therefore, that retrial would not place a defendant in double jeopardy. Willingham v. State, 50 Ala. App. 363, 279 So.2d 534, 537, cert. *Page 297 denied, 291 Ala. 803, 279 So.2d 538 (1973)."
Id. at 448-49. The Court further indicated that there was no record of any objections to the declaration of mistrial in any of the three previous trials.
As the State points out in its brief, the Alabama Supreme Court's decision in Anderson is binding on this court. §12-3-16, Code of Alabama (1975).
 III
The appellant argues that his conviction abrogates the reasonable doubt standard in that "[p]rior to the fourth trial of the defendant, the cumulative total of the voting by the juries was twenty-seven votes for acquittal, nine for conviction. Following Defendant's conviction, the cumulative vote total was still twenty-seven for acquittal, twenty-one for conviction." Thus, the appellant claims that this tally should raise a reasonable doubt as to the validity of the jury verdict.
As the appellant points out in his brief, the United States Supreme Court has held that due process protects a defendant against conviction unless there is proof beyond a reasonable doubt. In re Winship, 397 U.S. 358, 90 S.Ct. 1068,25 L.Ed.2d 368 (1970). However, in Ex parte Anderson, supra, at 449-51, the Alabama Supreme Court found that the circumstances of this case do not present a breach of due process:
 "Although the total number of votes of all jurors in this case favored acquittal and no new evidence is expected at the next trial, we still feel that a mechanical formula based on jury votes and evidentiary expectations is not enough to dismiss an indictment in a capital murder case."
Id. at 451.
Furthermore, the appellant's conviction upon his fourth retrial did not violate due process. This issue was also decided adversely to the appellant in Anderson, supra, wherein despite the Court's recognition that the appellant presented a valid argument and that, under certain circumstances, retrials may result in a breach of due process, such is not the case under the facts at hand.
 IV
The appellant contends that the trial court abused its discretion in denying his request for a continuance in order to locate and interview newly discovered witnesses. The record indicates that before the jury venire was present, the defense counsel moved for a continuance, stating that during the week prior to this hearing he had received a letter from the prosecutor stating that, pursuant to a conversation with the former deputy district attorney, he had become aware of two additional witnesses. The letter identified one of the witnesses as Phyllis Johnson, a correctional officer for the City of Birmingham, and the other witness was not identified. However, the defense counsel stated that approximately two days later, at a hearing, the prosecutor identified the other witness as being Shirley Stewart, but stated that he had no information as to her whereabouts. Subsequently, the prosecutor sent the defense counsel a copy of a tape recording of a conversation between Ms. Johnson and a member of the Birmingham police force. Although the defense counsel attempted to arrange a meeting with Ms. Johnson, he was unable to do so. Defense counsel further stated that the prosecutor later provided him with certain information about Ms. Stewart, namely that her mother lived in Ensley and that Ms. Stewart was apparently somewhere in Michigan with her husband. The prosecutor had also informed the defense counsel that he did not intend to call either Ms. Stewart or Ms. Johnson and, in fact, neither individual was called to testify at the trial. The defense counsel contended that he should be accorded the opportunity to interview each of these witnesses and, because Shirley Stewart was somewhere in Michigan, he maintained that he should be provided funds with which to go to Michigan and interview her. The trial court responded:
 "In regards to the witness, who may or may not be somewhere in the Midwest, there's no indication that a continuance *Page 298 
for any period of time would be successful in locating that person.
 "I'm going to deny your motion for a continuance on those grounds and, of course, give you an exception to my ruling."
The rule in Alabama has been stated as follows:
 " 'In general, motions for continuances in criminal cases are matters within the discretion of the trial court. . . . The measure of impropriety which must be shown by an appellant to hold the court in error for denial of a motion for continuance of a criminal trial is gross abuse.' Richardson v. State, 476 So.2d 1247 [at 1248] (Ala.Crim.App. 1985) (citation omitted)."
Frazier v. State, 528 So.2d 1144 (Ala.Cr.App. 1986). See alsoBeauregard v. State, 372 So.2d 37 (Ala.Cr.App.), cert. denied,372 So.2d 44 (Ala. 1979). "A reversal of a conviction because of the trial court's refusal to grant a continuance requires 'a positive demonstration of abuse of judicial discretion.' "Young v. State, 469 So.2d 683, 687 (Ala.Cr.App. 1985). That above rule "clearly applies to cases where the continuance is sought due to an absent witness." Id., at 687, citingBailey v. State, 398 So.2d 406 (Ala.Cr.App. 1981); Weaver v.State, 401 So.2d 344 (Ala.Cr.App. 1981); and Pritchett v. State,445 So.2d 984 (Ala.Cr.App. 1984).
 "The general rule is that '[a] movant [for a continuance] must show that due diligence has been exercised to obtain the attendance of the witness, that substantial favorable testimony would be tendered by the witness, that the witness is available and willing to testify, and that the denial of a continuance would materially prejudice the defendant.' United States v. Uptain, 531 F.2d 1281, 1287 (5th Cir. 1976)."
Goodwin v. State, 516 So.2d 818 (Ala.Cr.App. 1986).
In the present case, there has been no showing that Mrs. Stewart could ever be located. There has been no showing made as to the expected testimony of either witness, or as to "the nature and materiality of the evidence sought" of those witnesses. Gast v. State, 232 Ala. 307, 310, 167 So. 554, 556
(1936). See also Dobbins v. State, 487 So.2d 1018, 1020
(Ala.Cr.App. 1986). " 'Denial of a continuance is not palpable abuse of discretion in the absence of a showing as to what the witness would testify to.' Fields v. State, 424 So.2d 697, 699
(Ala.Cr.App. 1982)." Bracy v. State, 473 So.2d 1133, 1134
(Ala.Cr.App. 1985). See also Dobbins v. State, supra.
Furthermore, according to the record, the testimony of Phyllis Johnson would have been merely cumulative and, therefore, there was no abuse in failing to grant a continuance because of her absence at trial. See Barton v. State, 494 So.2d 943, 949-50
(Ala.Cr.App. 1986); Primm v. State, 473 So.2d 547
(Ala.Cr.App. 1984).
The appellant cites Dickerson v. Alabama, 667 F.2d 1364 (11th Cir. 1982), cert. denied by Alabama v. Dickerson, 459 U.S. 878,103 S.Ct. 173, 74 L.Ed.2d 142 (1982) to argue in his brief that "when faced with the question of the propriety of a grant or a denial of a continuance for the purpose of producing a defense witness, the proper question is not whether the trial judge abused his discretion, but whether the denial of the continuance violated the defendant's constitutional rights to compulsory process and effective assistance of counsel." However, this court has recently quoted the pertinent language from Dickerson in Barton v. State, 494 So.2d 943, 949
(Ala.Cr.App. 1986), wherein it was stated:
 " 'Not every denial of a motion for continuance to obtain witnesses violates the accused's right to compulsory process. See, e.g., McKinney v. Wainwright, 488 F.2d 28 (5th Cir.), cert. denied, 416 U.S. 973, 94 S.Ct. 1998, 40 L.Ed.2d 562 (1974). A court may not, however, refuse to grant a reasonable continuance for the purpose of obtaining defense witnesses where it has been shown that the desired testimony would be relevant and material to the defense. Hicks v. Wainwright, 633 F.2d 1146
(5th Cir. 1981); Singleton v. Lefkowitz, 583 F.2d 618 (2d Cir. 1978). In Hicks this Court *Page 299 
recently enunciated several factors which are to be considered in determining whether an accused was deprived of his right to compulsory process by denial of a motion for continuance:
 " ' "The diligence of the defense in interviewing witnesses and procuring their presence, the probability of procuring their testimony within a reasonable time, the specificity with which the defense is able to describe their expected knowledge or testimony, the degree to which such testimony is expected to be favorable to the accused, and the unique or cumulative nature of the testimony."
 633 F.2d at 1149 (quoting United States v. Uptain, 531 F.2d 1281, 1287 (5th Cir. 1976) (footnotes omitted).)'
 "Dickerson v. Alabama, 667 F.2d 1364, 1369-70 (11th Cir. 1982) (footnote omitted). See also Dale v. State, 466 So.2d 196 (Ala.Crim.App. 1985); Firth v. State, 493 So.2d 397 (Ala.Crim.App. 1986)."
It is clear that the appellant has not made the requisite showing in order to prove that he was deprived of his right to compulsory process as a result of a denial of his motion for continuance.
 V
The appellant contends that his rights to equal protection and due process were violated by the trial court's failure to strike the entire venire on the basis of Hunter v. Underwood,471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985). Specifically, the appellant alleges that the State was allowed to indirectly "purposely exclude blacks from serving on a jury," an act which the State is not permitted to do directly, i.e., use its peremptory challenges to systematically exclude blacks. The appellant concedes in brief that there is no indication from the record that the State used its peremptory challenges to systematically exclude blacks from the jury, which was comprised of ten whites and four blacks, as prohibited under the doctrine of Batson v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
In Hunter v. Underwood, supra, the United States Supreme Court held that Article VIII, Section 182, of the Alabama Constitution of 1901, which provides for the disfranchisement of persons convicted of certain enumerated felonies and misdemeanors, including "any . . . crime involving moral turpitude," served to discriminate against blacks; thus it violated the Equal Protection Clause of the Fourteenth Amendment. The appellant argues that because jury lists are customarily taken from the voter registration list, he should have been allowed to interview the individual who did the preliminary voir dire examination, to determine if jurors were excluded from the venire on the basis of convictions of crimes involving moral turpitude. There is no evidence in the record that the jury lists in Mobile County were taken from voter registration lists, nor is there any indication that anyone was excluded from the venire because of a conviction of a crime of moral turpitude. During the voir dire, the trial judge asked, "Is there anyone here that's lost the right to vote for reason of being convicted of a crime — any serious felony or criminal offense involving moral turpitude?" The record indicates that no one was struck as a result of this question. Furthermore, the trial judge explained that this question was merely a string of other questions which he asked as part of his introductory remarks to the jury in order to make them aware of the type of question which they might be asked. He further stated that he was not present when the jury venire was in fact empanelled or qualified and had no way of knowing what questions were asked. Thereafter, the trial judge specifically denied the defense counsel's motion to strike the venire, and no ruling was made on the defense counsel's request that he be allowed to interview the individual who conducted the preliminary voir dire. See Stevens v. State, 451 So.2d 402
(Ala.Cr.App. 1984).
Even assuming that the statute, Section 12-16-60(a)(4), was applied and that this issue is preserved despite the defense counsel's failure to file a written motion to quash the venire, see Chambliss v. State, 373 So.2d 1185, 1205 (Ala.Cr.App. 1979), *Page 300 
writ denied Ex parte Chambliss, 373 So.2d 1211 (Ala. 1979) we find that this statute is constitutional. Section 12-16-60,Code of Alabama (1975), as amended in 1978, reads in pertinent part:
 "(a) A prospective juror is qualified to serve on a jury if the juror is generally reputed to be honest and intelligent and is esteemed in the community for integrity, good character and sound judgment and also:
". . .
 "(4) Has not lost the right to vote by conviction for any offense involving moral turpitude."
The constitutionality of this subsection and its mandatory application to a prospective juror, has not been examined and, in light of the finding in Hunter that denying the vote to persons convicted of certain crimes, including "any . . . crime involving moral turpitude" is unconstitutional, we feel that the constitutionality of this requirement should be explored. Therefore, this examination will look to the history of this statute and the legislative purpose thereof under the application of the holding in Hunter.
The Supreme Court in Hunter determined that § 182 was unconstitutional under the following guidelines for analysis. Although § 182 is racially neutral on its face, applying equally to anyone convicted of one of the named crimes or categories of crimes, the appellee was able to prove a racially discriminatory impact.[1] A neutral State law that produces disproportionate effects along racial lines is subject to analysis under Village of Arlington Heights v. MetropolitanHousing Development Corp., 429 U.S. 252, 97 S.Ct. 555,50 L.Ed.2d 450 (1977). Under Arlington Heights, a racially disproportionate impact alone does not make official action unconstitutional; rather, a discriminatory purpose or intent must be shown to prove a violation of the Equal Protection Clause. "Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."Hunter v. Underwood, supra, 471 U.S. at 228, 105 S.Ct. at 1920,85 L.Ed.2d at 228. Looking back to the history of the 1901 Alabama Constitutional Convention, the Supreme Court determined "that discrimination against blacks, as well as against poor whites, was a motivating factor for the provision and that § 182 certainly would not have been adopted by the Convention or ratified by the electorate in the absence of the racially discriminatory motivation." Hunter v. Underwood, supra,471 U.S. at 231, 105 S.Ct. at 1922, 85 L.Ed.2d at 230. The Court further refused to accept the appellant's contention that the State had a legitimate interest in denying the franchise to those convicted of crimes involving moral turpitude, because the Court found that such a purpose was not a motivating factor of the 1901 Convention. The Court further found no merit in the State's contention that despite the original purpose of § 182, subsequent events had legitimated the provision, stating that "[w]ithout deciding whether § 182 would be valid if enacted today without any impermissible motivation, we simply observe that its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect. As such, it violates equal protection under Arlington Heights." Hunter v.Underwood, supra, 471 U.S. at 233, 105 S.Ct. at 1923,85 L.Ed.2d at 231. After Hunter, an individual in Alabama can no longer be disfranchised because he has been convicted of a crime involving moral turpitude, unless the crime punishable by imprisonment in the penitentiary. *Page 301 
The analysis and holding in Hunter have since been used where black citizens challenged the constitutionality of an at-large method of electing county commissioners and school board members, Dillard v. Crenshaw County, 640 F. Supp. 1347, 1358
(M.D.Ala. 1986); where a black nurse filed a discrimination suit against a hospital on the basis of adverse employment decisions, Davis v. State University of New York, 802 F.2d 638,644-45 (2d Cir. 1986); where minority police officers brought a civil rights action alleging employment discrimination,Minority Police Officers Association v. City of South Bend,617 F. Supp. 1330 (N.D. Ind. 1985); where an employee alleged discrimination on the basis of his religion, Blalock v. MetalsTrades, Inc., 775 F.2d 703, 710-11 (6th Cir. 1985); and where a convicted black felon challenged a Tennessee statute which disfranchised convicted felons, Wesley v. Collins,791 F.2d 1255, 1261-63 (6th Cir. 1986) (citing Green v. Board ofElections of City of New York, 380 F.2d 445 (2d Cir. 1967), cert. denied, 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840
(1968), which emphasized that the disfranchisement of felons "has never been viewed as a device by which a state could discriminatorily exclude a given racial minority from the polls.").
Historically, in Alabama, the qualifications of persons on a jury roll were addressed under Title 30, Section 21, Code ofAlabama (1940), and Title 30, Section 21, Code of Alabama
(Recomp. 1958). Both of these statutes required that in order to qualify to be a potential juror, the person must have never "been convicted of any offense involving moral turpitude." No mention is made as to disfranchisement on these grounds. This section was held constitutional on its face, Bokulich v. JuryComm'n of Greene County, Ala., 298 F. Supp. 181 (N.D.Ala. 1968);Seals v. State, 282 Ala. 586, 213 So.2d 645 (1968), and neither was adopted for nor promoted the purpose of fostering racial discrimination. Carter v. Jury Comm'n, 396 U.S. 320,90 S.Ct. 518, 24 L.Ed.2d 549 (1970).
 "[T]he purpose of the Alabama statutes is to insure at least a reasonable approximation to the requirements that jury venires include all qualified persons, and, hence, represent a cross-section of the community, with no significant groups being excluded without justifiable reasons; therefore, the procedures outlined by the Alabama statutes can and do serve . . . as a standard by which the actions of the jury commissioners can and should be judged."
State ex rel. Gregg v. Maples, 286 Ala. 274, at 279,239 So.2d 198, at 204 (1970), quoting Mitchell v. Johnson, 250 F. Supp. 117, at 122 (N.D.Ala. 1966).
 "At common law, it was requisite that all persons serving on juries should be good and lawful men, by which was intended that they must be neither aliens nor persons outlawed or attainted of any treason or felony which might render them infamous, and it has been held in a number of cases decided under the common law, as well as under special statutory or constitutional provisions, that a person convicted of crime is disqualified as a juror, or that he is properly excused from such service on that ground."
47 Am.Jur.2d Jury § 106 (1969). See also Annot., 126 A.L.R. 521 (1940). Furthermore, "a common requirement or qualification [to serve as a juror] is that a juror be a qualified elector or voter of the county or district, or have such qualifications as are prescribed in the laws for an elector or a voter." 47 Am.Jur.2d Jury § 102 (1969).
 "The States remain free to confine the selection [for a jury roll] to citizens, to persons meeting specified qualifications of age and educational attainment, and to those possessing good intelligence, sound judgment, and fair character. 'Our duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, so long as the source reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty.' "
Carter v. Jury Comm'n, 396 U.S. 320, 332-33, 90 S.Ct. 518, 525,24 L.Ed.2d 549 (1970), quoting Brown v. Allen, *Page 302 344 U.S. 443, 474, 73 S.Ct. 397, 416, 97 L.Ed. 469 (1953).
In looking to the purpose in requiring that a prospective juror "has not lost the right to vote by conviction for any offense involving moral turpitude," we note that other sources have similar provisions.
 "Under the federal statute [28 U.S.C. § 1865(b) (1982)], any person is qualified unless he (or she)
" '. . .
 " '(5) has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored."
 "The Uniform Jury Selection and Service Act contains an analogous provision. . . .
 "It is obvious that the federal and uniform acts seek to limit disqualification to a few objective factors that most persons would agree are disabling. The effect should be to eliminate subjectivity in the selection process and increase the representativeness of the panel."
Starr and McCormick, Jury Selection 35 (1985).
The American Bar Association has established a model setting forth four categories of persons who should be ineligible for jury service. In so doing, this group stated:
 "The final restriction excludes individuals convicted of a felony who have not had their civil rights restored [Restoration of civil rights refers to the process for reinstating those rights and privileges automatically lost by an individual upon conviction of a felony, such as the right to vote or to hold public office. See, e.g., Arizona Rules of Criminal Procedure 29.] Most states currently exclude felons from serving on a jury. Many felons 'might well harbor a continuing resentment against "the system" that punished [them] . . . and an equally unthinking bias in favor of the defendant on trial.' Moreover, the presence on a jury of convicted felons who have not had their civil rights restored through the applicable state procedure tends to weaken respect for the judicial system."
American Bar Association, Standards Relating to Juror Use andManagement 50 (1983). In proposing steps for implementation of its standards, the American Bar Association suggests that "a statutory requirement of 'good moral character' may be interpreted to mean no felony conviction or the restoration of civil rights following such a conviction." Id.
Other states have enacted similar statutes or statutes which promote similar results. See e.g. § 21-201, Code of Arizona, which requires that "[e]very juror, grand and trial, shall be an elector in the county." In the commentary to this code section, the committee cites State v. Bojorquez, 111 Ariz. 549,535 P.2d 6 (1975), stating that the "[j]ury selection process whereby [the] jury commissioner automatically excluded convicted felons, whose civil rights had not been restored, from jury service was not unconstitutional. . . . Since jurors in Arizona must be electors, convicted felons cannot serve as jurors since they cannot vote, unless their civil rights are restored." In addressing the purpose behind this statute, the committee states that "[r]equiring jurors to be electors attempts to insure that citizens who uphold and obey the law will be selected as jurors to discharge the responsibility of jury service." See also Mathews v. Gibbs, 238 Ga. 680,235 S.E.2d 3 (1977) (holding that the appellant was ineligible to contest the election because he had been convicted of "felonies involving moral turpitude" and was thus not eligible to vote).
In Alabama, "the statutory prerequisite to jury service requiring the absence of any conviction of an offense involving moral turpitude is an absolute" and mandates disqualification if a prospective juror falls in that category. Chrysler CreditCorp. v. McKinney, 456 So.2d 1069, 1071 (Ala. 1984), citingBeasley v. State, 39 Ala. App. 182, 96 So.2d 693 (1957). "The purpose of this section [§ 12-16-60, Code of Alabama (1975)] is ' "to insure at least a reasonable approximation to the requirements that jury venires include all qualified persons, and, hence, represent a cross-section of the community." ' " Exparte Poole, *Page 303 497 So.2d 537, 543 (Ala. 1986). The Alabama Supreme Court in Poole, supra, emphasizes that the conviction of a crime of moral turpitude can be a ground for disqualification under § 12-16-60(a)(4) only if a person has lost his right to vote.[2]
 "Previously, '[b]eing an elector or not being an elector [was] irrelevant to a man's being a juror in Alabama,' Sanders v. State, 42 Ala. App. 419, 426, 167 So.2d 174, 180 (1964), but the legislature, in enacting Code 1975, § 12-16-60(a)(4), intended to make disfranchisement a focal, and relevant, consideration in determining a person's qualification for jury duty if, of course, a person's conviction of a crime involving moral turpitude was the cause of the denial of this right to vote."
Poole v. State, supra, at 545. The Court in Poole further interpreted this code section in light of the holding in Hunterv. Underwood, supra. The Court concluded that the Hunter
holding found § 182 in violation of the Fourteenth Amendment " 'with respect to those convicted of crimes not punishable byimprisonment in the penitentiary.' " Poole, supra, at 544. (Emphasis added in Poole.) Although the Court in Poole related the holding in Hunter only to the particular appellant in that case, it is clear that the Court's interpretation as to the interplay between that code section and the relevant constitutional code section in Hunter results in a disqualification of jurors only where they have been convicted of crimes involving moral turpitude which are punishable byimprisonment in the penitentiary and, on that basis, have lost their right to vote.
In view of the history surrounding this statute, and in view of the non-discriminatory legislative purpose behind this statute, and after determining the effect of the Supreme Court's decision in Hunter on this statute, we conclude that it is constitutional on its face. Furthermore, because there has been no showing of a disproportionate impact on blacks because of this section, see Smith v. State, 482 So.2d 1312
(Ala.Cr.App. 1985), and no showing of a discriminatory intent, the appellant's claim is without merit.
 VI
The appellant argues that the trial court abused its discretion by denying his motion for mistrial based on the unresponsive testimony of two witnesses. The first unresponsive answer occurred during the cross-examination of State's witness Lula White, an eyewitness to the shooting of Sergeant Ballard:
 "Q. [Defense Counsel]: All right. So, whether he was beckoning for that man or some other man, all you know is the police officer moved his arm?
 "A. [Mrs. White]: Well, I know one thing, I know he shot the man.
"Q. All right. And you know that man shot the man?
"A. Yeah, I know he did.
"Q. You did not see a gun?
"A. I did not see a gun."
Shortly thereafter, the following occurred:
 "Q. Well, there was nothing blocking your view as you looked across the street, was it?
"A. Well, I know one thing —
 "THE COURT: Please, ma'am. If you will listen to the question and answer what he will ask. [The prosecutor] will have an opportunity to ask questions later.
 "[Defense Counsel]: Sir, could we have a brief recess?"
During the recess, the defense counsel moved for a mistrial, objecting to Mrs. White's statement that she knew the appellant shot the man as unresponsive. The trial court denied the motion for mistrial, stating that he did not think the statement was prejudicial taken in the context "of the nature of the question and where we were in questioning the witness." The trial judge then offered to exclude the answer *Page 304 
and to give an appropriate jury instruction. He also offered to allow the defense counsel the right to continue to cross-examine the witness as much as he deemed necessary. When the jury returned, the trial court gave extensive instructions as to the nature of Mrs. White's response and further instructed the jury to disregard that answer. The jury indicated that it would disregard the statement.
Because of the untimeliness of the objection and the trial court's action in instructing the jurors, the appellant's motion was properly denied.
 "Where the trial court immediately instructs the jury not to consider a fact, that instruction in effect removes or excludes that matter from the jury's consideration. The prejudicial effect of the statement is deemed to be cured by such instructions. Richardson v. State, 374 So.2d 433
(Ala.Cr.App. 1979). The trial judge's immediate charge to the jury to disregard an impropriety raises a prima facie presumption against error. Kelley v. State, 405 So.2d 728 (Ala.Cr.App.), cert. denied, 405 So.2d 731 (Ala. 1981). The court did not err in denying the motion for mistrial."
Bradley v. State, 450 So.2d 173, 176 (Ala.Cr.App. 1983).
The other testimony which the appellant alleges was erroneous occurred during the re-cross-examination of a firearms expert by the defense counsel:
 "Q. It is correct, is it not, Mr. Yates, that you can make no actual connection between the so-called evidence hulls and the what you have listed as evidence slugs, isn't that correct?
"A. No.
"Q. That's not correct?
"A. No.
 "Q. Well, you made a conclusion that the so-called evidence slug, or rather hulls, were fired from that Exhibit 10. That was your opinion, right?
"A. That is my opinion, yes.
 "Q. But, you did not actually directly connect the so-called evidence slugs with the evidence hulls, did you?
 "A. Other than the fact that I know they all were fired in that gun, no.
 "[Defense Counsel]: May it please the court, I object to what he knows.
"THE COURT: Sustained.
 "[Defense Counsel]: Ask the court to instruct the jury to disregard that statement.
 "THE COURT: Disregard that last statement as non-responsive."
No motion for mistrial was made by the defense counsel. Thus, there is no adverse ruling for this court to review.Channell v. State, 477 So.2d 522 (Ala .Cr. App. 1985); Bell v.State, 466 So.2d 167 (Ala.Cr.App. 1985).
 VII
The appellant argues that the trial court erred in excepting the victim's widow from the rule. The record indicates that the victim's widow, Kalliopi Ballard Hartley, testified only that, on the day of the murder, her husband left home in his police uniform and that the next time that she saw him, he was dead. Clearly, these facts were undisputed.
 "Where the rule for the exclusion of witnesses from the courtroom is invoked, it is within the sound discretion of the trial court to allow any one of the witnesses to remain in the courtroom during the examination of the others and the exercise of this discretion is not reviewable on appeal. Huskey v. State, 129 Ala. 94, 29 So. 838
(1901); Barnes v. State, 88 Ala. 204, 7 So. 38
(1890); Stone v. State, 55 Ala. App. 663, 318 So.2d 359 (1975)."
Young v. State, 416 So.2d 1109, 1111 (Ala.Cr.App. 1982).
Furthermore, under § 15-14-55, Code of Alabama (1975), "A victim of a criminal offense shall be exempt from the operation of rule of court, regulation, or statute or other law requiring the separation or exclusion of witnesses from court in criminal trials or hearings." Under § 15-14-56(a), "[w]henever a victim is unable to attend such trial or hearing or any portion thereof by reason of death . . . the victim's family may select a representative who shall be entitled to exercise any right *Page 305 
granted to the victim, pursuant to the provisions of this article." Although the appellant argues that these statutes have no application in his case, because the offense occurred prior to their enactment, the defendant's trial took place after its enactment, and therefore the statute applies to this case. See, for example, Loper v. State, 469 So.2d 707, 712
(Ala.Cr.App. 1985).
 VIII
The appellant argues that the trial court erred in denying him access to a transcript of each of his two prior trials. The appellant claims that this denial resulted in preventing him from thoroughly cross-examining the State's witnesses and prevented him from preserving and providing a full and complete record on appeal. However, in Ex parte Cochran, 500 So.2d 1179
(Ala. 1985) an appellant claimed that the trial court committed error by failing to furnish him with transcripts of his first trial and other proceedings so that he could effectively cross-examine and impeach the State's witnesses. In Cochran, the Alabama Supreme Court affirmed the trial court's decision because an "adequate substitute" was available in that one of the attorneys who had represented him throughout his litigation "represented him from the preliminary hearing through the third trial." 500 So.2d at 1184-85. Further, the Court stated that the record indicated that the defense counsel had at least "some transcription of the testimony of several witnesses, since he referred the witnesses to their previous testimony on several occasions during cross-examination." Id. at 1185. Similarly, in the case at bar, the record indicates that the same attorney who represents the appellant on this appeal also represented him during his third trial, and has been acting as his attorney at least since 1979. Furthermore, during the cross-examination of several of the State's witnesses, the defense counsel was able to recall their testimony from the previous trials and, moreover, attempted to introduce the previous testimony of at least one State's witness, Lula White, into evidence in order to show that she had changed her testimony. The record reveals no prejudice caused to the appellant because of the failure to make these two prior transcripts a part of the record.
 IX
The appellant contends that his conviction is due to be reversed on the basis of cumulative error. In addition to the arguments already raised, the appellant claims that the trial court erred in denying his motion for continuance on the basis of newly discovered witnesses and on the basis of pre-trial publicity; in failing to grant his motion for mistrial on the basis of the relationship between Lula White and the victim's widow; in the denial of his motion for a mistrial after repeated violations of the trial court's order to prohibit filming of the jury by the news media.
As to the argument regarding the filming of the jury, the record indicates that on approximately six occasions, photographers appeared either in the two windows (approximately four inches wide and 36 inches long) in the courtroom or in the doorway in order to take pictures. The defense counsel made a motion for mistrial because of this filming on three separate occasions. The trial court denied these motions and indicated that he had been observing the members of the jury and that all had appeared to be attentive to the trial and in no way distracted by the cameramen. The trial court further stated that the photographers had been instructed that they could on rare occasions take pictures "in such a way as not to distract the jurors." The judge stated:
 "I don't believe the jury is influenced by the fact that there are people interested in this trial. It was obvious from the questions that all the lawyers had that there was considerable pre-trial publicity. The jurors are aware of that fact.
 "They are intelligent people. They know coverage is continuing, because I have instructed them not to watch T.V., read papers, and so on. I don't believe it has a detrimental effect on the jurors by the fact the media is or is not interested in a particular case." *Page 306 
The trial judge thereafter offered to question the jurors en banc as to whether they had been influenced by the fact that there had been media coverage. The defense counsel declined the offer and asked that the jurors be questioned individually, which request the trial court refused.
We view this as a matter wholly within the discretion of the trial court. Were we to find prejudice in this case, we would have to totally disregard the presumption in favor of the trial court's ruling and resort to speculation.
 "The trial judge is vested with great discretion in the conduct of a trial, and, unless clear abuse of this discretion is apparent, the appellate courts will not interfere to set aside the lower court's action. Dolvin v. State, 51 Ala. App. 540, 287 So.2d 250 (1973). The trial court exercises this discretion in light of the circumstances of the particular case, and, in the absence of gross abuse, its actions are not reviewable by this court. McKee v. State, 253 Ala. 235, 44 So.2d 781
(1950)."
Snipes v. State, 364 So.2d 424, 427 (Ala.Cr.App. 1978). See alsoJackson v. State, 516 So.2d 726 (Ala.Cr.App. 1985), reversed on other grounds, Ex parte Jackson, 516 So.2d 768 (Ala. 1986).
There is also no merit to the appellant's claim that he should have been granted a mistrial because of the relationship between Lula White and the victim's widow. The record indicates that following Mrs. White's testimony, as she was leaving the courtroom, she turned to the victim's widow, waved and stated, "Bye-bye." Thereafter, the defense counsel moved for a mistrial and the trial court denied the motion, but allowed the defense counsel to question Mrs. White concerning whether there had been any contact between the victim's widow and her. During the defense counsel's examination of Mrs. White concerning this statement, she explained that she had not known the widow prior to the trial. However, during her trial testimony, and while the judge and counsel were absent from the courtroom, the widow approached the witness stand in which Mrs. White was seated and simply introduced herself. Mrs. White testified that aside from the introduction, nothing else occurred. While these actions were clearly improper, there is no indication that the appellant was so prejudiced as to require a mistrial.
 "Whether or not to grant a mistrial is a matter within the discretion of the trial court. Walker v. State, 416 So.2d 1083
(Ala.Crim.App. 1982); Wood v. State, 416 So.2d 794
(Ala.Crim.App. 1982); Bowman v. State, 401 So.2d 333
(Ala.Crim.App. 1981); Edgeworth v. State, 304 So.2d 911, 54 Ala. App. 93 (Ala.Crim.App. 1974). A trial court will not be reversed for denying a motion for mistrial unless a clear abuse of discretion is shown."
Davis v. State, 457 So.2d 992, 994 (Ala.Cr.App. 1984) (wherein a juror was observed talking to the victim during a recess).
As to the trial court's refusal to grant a continuance because of pre-trial publicity concerning other crimes involving police, the record indicates that the defense counsel's motion was based on a killing of a police officer and an attempt to shoot an officer, both of which occurred shortly before this trial, and a prosecution of a Ku Klux Klan member for the killing of a black man, which was purportedly motivated by the jury's inability to reach a verdict in the defendant's three prior trials. The defense counsel introduced newspaper articles to support his claim.
A defendant is entitled to a panel of impartial jurors; however, in order to be qualified, the jurors need not be totally ignorant of the facts and issues involved. Dobbert v.Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977);Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589
(1975). Except where inherently prejudicial publicity has so saturated the community as to have a probable impact upon the prospective jurors, the trial court's main responsibility with regard to allegedly prejudicial pre-trial publicity is to determine whether, as the result of such publicity, it is reasonably unlikely that the defendant can secure a fair and impartial trial. Sheppard v. Maxwell, 384 U.S. 333, *Page 307 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas,381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). Absent a showing of actual prejudicial influence on the jury, the trial court's denial of a motion for continuance will not be reversed. Dolvinv. State, 391 So.2d 666, 674-75 (Ala.Cr.App. 1979), affirmed,391 So.2d 677 (Ala. 1980); Turk v. State, 348 So.2d 878, 880
(Ala.Cr.App. 1977). The record indicates that the prospective jurors indicated that despite their knowledge of the events concerning the shootings of the police officers, they could remain impartial and would base their decision on the evidence presented. Furthermore, there is no evidence in the record that the jurors were even aware of the Klan killing. Thus, the defendant has failed to meet his burden.
Although the appellant argues that the cumulative effect of all of the alleged errors entitles him to a new trial, we find no ineradicable prejudice caused to the appellant and we find that he was not deprived of a fair and impartial trial. SeeWilhite v. State, 485 So.2d 777, 786 (Ala.Cr.App. 1985), judgment affirmed by Ex parte Wilhite, 485 So.2d 787
(Ala. 1986).
AFFIRMED.
All the Judges concur, except BOWEN, P.J., who concurs in the result only.
[1] " 'The registrars' expert estimated that by January 1903 § 182 had disfranchised approximately ten times as many blacks as whites. This disparate effect persists today. In Jefferson and Montgomery Counties blacks are by even the most modest estimates at least 1.7 times as likely as whites to suffer disfranchisement under Section 182 for the commission of non-prison offenses.' " Hunter v. Underwood, supra,471 U.S. at 227, 105 S.Ct. at 1920, 85 L.Ed.2d at 228, quoting the Court of Appeals' finding at 730 F.2d 620.
[2] "Our opinion today should not be construed as holding that a party may not make inquiry about prior convictions of crimes involving moral turpitude that do not result in a loss of the right to vote. We only hold that convictions of these crimes do not result in disqualifying a jury for cause." Id. at 545.